IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 107,957

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL A. REED,
*Appellant*.

SYLLABUS BY THE COURT

1.

When an issue of criminal restitution has been left open by a sentencing judge and the defendant files a notice of appeal before the restitution issue is fully settled, the notice of appeal is premature and lies dormant until final judgment is pronounced in district court and the appeal process begins. Such a procedure does not deprive the appellate court of jurisdiction.

2.

Under subsection (b) of K.S.A. 21-3436, an alleged aggravated battery must be "so distinct" from the alleged felony murder it supports so "as to not be an ingredient of the homicide." The question of whether such a distinction exists is one of law for the court, not one of fact for the jury. A criminal defendant is not entitled to an instruction telling his or her jurors that they must make a specific finding on the existence or nonexistence of the distinction, and the absence of such an instruction does not entitle the defendant to an appellate ruling that the two offenses merged.

1

3.

Because the question of whether an underlying alternative offense and a felony murder are so distinct that merger is prevented is one of law for the court, a defendant's challenge to the sufficiency of evidence to persuade a jury on that point is without merit.

4.

A challenge to the sufficiency of evidence to support an alternative underlying offense for felony murder is waived or abandoned if not raised in an appellate brief.

5.

A district court judge does not err in refusing to give a criminal defendant's requested voluntary intoxication instruction when the evidence shows mere consumption of alcohol, not resulting impairment of the ability to form the requisite criminal intent.

6.

When the State raises specific legal issues, arguments, or theories during pretrial proceedings on the admissibility of evidence—thus giving a district judge an opportunity to rule on these issues, arguments, and theories as well as on those relied upon by the defense—and the defendant invokes the pretrial proceedings when renewing his or her objection to admission of the evidence at trial, the issues, arguments, and theories raised initially by the State are preserved for review if pursued by the defendant on appeal.

7.

A district judge does not err under the Confrontation Clause of the Sixth Amendment nor under K.S.A. 60-460(e) when he or she admits evidence of an out-of-court declarant's statements, if the district judge has not abused his or her discretion in identifying the statements as dying declarations. On the record in this case, there was no abuse of discretion: The district judge employed the correct legal standard; had

substantial competent evidence to support his factual findings; and issued a ruling that was not arbitrary, fanciful, or unreasonable.

8.

The cumulative error doctrine does not apply when multiple errors have not been identified.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed July 10, 2015. Affirmed.

*Carl F.A. Maughan*, of Maughan & Maughan LC, of Wichita, argued the cause, and *Catherine A. Zigtema*, of Law Office of Kate Zigtema, LC, of Lenexa, was with him on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER J.: Defendant Michael Reed appeals his first-degree felony-murder conviction, arising out of the shooting death of Vincent Barnes. Reed raises several instructional issues, a sufficiency of the evidence challenge, and a hearsay challenge. He also asserts entitlement to reversal because of cumulative error. For its part, the State questions whether this court has jurisdiction to consider Reed's appeal in the first place.

As detailed below, we hold that we have jurisdiction over Reed's appeal, but none of his arguments lead to the relief he seeks.

## FACTUAL AND PROCEDURAL BACKGROUND

On the night of May 15, 2009, Reed; Reed's brother, Robert; and Jeremy Trout went to a bar for an impromptu bachelor party for Robert. The three men drank beer and had several shots of liquor. After about an hour, Reed and Trout left to meet Reed's girlfriend, who was going to give them some money.

Reed called Barnes in an attempt to purchase cocaine. Trout would later testify that "the guy [Reed] called had owed him from a past deal. I think [Reed] was trying to get some more, and towards the tab, and take it off his tab or whatever. But the guy ended up hanging up." Although Reed called Barnes back several times, Barnes never answered.

After obtaining the money, Reed and Trout returned to the bar. Trout would later testify that Reed told Robert "that the guy had hung up [on him], and he felt like he was trying to punk him."

A short time later, the trio left the bar and spent about 30 minutes at Reed's house. Reed then decided to try to buy cocaine from a man named Stacie. The group drove to two separate bars to look for Stacie, but never found him.

Reed then drove the group to Barnes' apartment. When they knocked, Barnes' sister, Alexia, answered the door. Reed was the first to enter, followed by Trout, and then Robert. Trout would eventually testify that "[Reed] was just talking to [Barnes]. Just, you know, why did you hang up on me, I thought we was friends, and just conversation like that." According to Trout, at that point, "Robert, he starts ranting and raving, [h]anging up on my brother, man, trying to punk my bro." Alexia's eventual testimony would be

similar: When Robert came in, he "was yelling, why are you hanging up on my brother like that?" and then began to argue with Barnes and pulled out a gun.

Robert fired a shot into the ceiling of the apartment. Barnes told Alexia to call the police. As she started to walk out of the apartment to do so, Robert held the gun to her head and said, "Call the cops, you bitch." Meanwhile, Trout grabbed Barnes and Reed began punching Barnes. Eventually Robert joined in, and Alexia left the apartment. At some point, Robert shot Barnes in the stomach from "very close" range.

Exactly who remained in the apartment at the time Barnes was shot would be disputed at trial. Alexia said she was running back up a set of stairs toward the apartment when she heard the shot and saw Reed, Robert, and Trout run out of the apartment. But both Robert and Trout would testify that neither Reed nor Trout was in the apartment when Robert shot Barnes.

After the shooting, Alexia found Barnes' cell phone and looked at his last call, which was from a person listed on the phone as "Micky Norms." Alexia would testify at trial that she asked Barnes who shot him, "if it was—in the phone it was Micky Norms. And I was like, Did Micky shoot you, did Micky shoot you. And he said, Yes."

Christopher Marceau and Daniel Gumm were the first police officers to reach the scene. For safety reasons, the officers parked their patrol cars outside of the apartment complex and walked in. They could hear a man yelling for an ambulance.

When the officers found Barnes, they attempted to put pressure on his wound. Marceau would testify that he asked Barnes who shot him. According to Marceau, Barnes

"stated the first name Micky several times. Then he [stated] Micky Norms or Micky North. Micky was clear, I could hear he was saying [] Micky. And then the Norm or North was not as clear, probably because of Vincent not—he stated that he wasn't able to breathe very well. And so that last part, Norms or North, I could not hear very well."

A third officer, Jason Newberry, also would testify that Barnes identified the shooter as "Mickie or Nicky." In addition, when Newberry asked Barnes, Barnes told him it was "a .38, which was pretty specific. So I backed up. And I asked him, revolver or semiautomatic. He says, revolver .38."

Ambulance workers put Barnes on a stretcher, but Newberry would testify that "between the time they get to the top of the stairs and down the stairs, [Barnes] had quit struggling and he didn't look . . . like he was breathing [anymore]." Barnes was identified "code blue" in the ambulance and pronounced dead at the hospital.

Investigators examined Barnes' phone and found a contact for "Mickie Norms Buddy." They learned that the number associated with this contact was attributed to Reed and that Barnes had received one connected call from that number on the night of his death. The one call was followed by a series of missed calls from the same number.

Reed, Robert, and Trout were arrested the day after Barnes' death. Reed was charged with first-degree felony murder, based either on possession of cocaine or on aggravated battery, and with aggravated assault of Alexia.

The State filed a pretrial motion in limine to admit the statements Barnes had made before his death, both to his sister and to first responders. After hearing arguments on the issue, the district judge ruled that Barnes' statements qualified as admissible dying declarations. Specifically, the district judge said:

6

"Vincent Barnes' statements are reliable, they are voluntary. The evidence—there's no evidence of any coercion. In fact, the evidence is to the contrary. . . . [Barnes'] statements are the result of a question by an officer and his—and his sister, but there's no pressure applied other than the fear of death. So I believe they are voluntary. I believe they are in good faith. I think the evidence supports no bad motive by [Barnes]. There's no evidence that he was acting on bad information. And so I believe that my ruling would be that his statements are voluntary and in good faith. So the next element is: Was [Barnes] conscious of his impending death and did he believe there was no hope of recovery? I look at Officer Newberry. He testified the facts of the situation when he discovered them, that when he—he heard a black male yell—what turned out to be a black male yelling for help. And [Barnes] would have been right under that person yelling for help, and so that would have added to the stress and added to the belief that he was about to die. There was blood on his abdomen. This is all from Newberry. There was blood on the floor and entry. The black male, the friend, was applying pressure. [Barnes] tried to get up. There's no question he was conscious. He was able to identify a .38 revolver and the name Mickey. He had difficulty speaking, difficulty breathing, he was coughing up blood, he was very 'panicked,' and he knew he had been shot. Officer Marceau confirmed all of that, but added that [Barnes] was on his knees at one point. He was swaying and staggering, trying to get up. There was blood coming out of the wound. [Barnes] specifically said 'I can't breathe' and also confirmed he was panicky. EMS . . . said that he was writhing in pain and was in, quote, a lot of pain. That [Barnes] was very upset. Quote, pretty much hysterical. In 16 minutes from the dispatch, [Barnes] was Code Blue and died. So we have a very short time from gunshot to actual death. There appears to be no question in my mind that the facts support that he was conscious and very aware of his impending death and he had no hope of recovery. I'm ruling that [Barnes'] statements come in based upon dying declaration. They are a dying declaration. And that is regardless of whether or not they are testimonial."

The district judge also ruled, in the event that the Confrontation Clause applied, see *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), that Barnes' statements were not testimonial and could also have been admitted under the

7

excited utterance exception to the hearsay rule. The district judge rejected the State's argument that Barnes' statements should be admissible under the doctrine of forfeiture by wrongdoing, in other words, because Reed's behavior prevented Barnes from being able to testify.

At the conclusion of Reed's trial, the district judge provided the jury with the following first-degree felony-murder instruction:

> "In Count One, Michael Reed is charged with the crime of Murder in the First Degree - Felony Murder. Michael Reed pleads not guilty.
>
> "To establish the charge, each of the following claims must be proved:
>
> > "1. That Michael Reed or another killed Vincent Barnes;
> >
> > "2. That such killing was done while in the commission of, attempting to commit, or in flight from committing or attempt to commit Possession of Cocaine or Aggravated Battery; and
> >
> > "3. That this act occurred on or about the 15th day of May, 2009 in Sedgwick County, Kansas.
>
> "The elements of Possession of Cocaine are as follows:
>
> > "1. That Michael Reed possessed cocaine;
> >
> > "2. That Michael Reed did so intentionally; and
> >
> > "3. That this act occurred on or about the 15th day of May, 2009 in Sedgwick County, Kansas.

"The elements of Aggravated Battery are as follows:

"1.      That Michael Reed intentionally caused bodily harm to another person in any manner whereby great bodily harm or death can be inflicted OR intentionally caused physical contact with another person in any manner whereby great bodily harm or death can be inflicted; and;

"2.      That this act occurred on or about the 15th day of May, 2009 in Sedgwick County, Kansas."

The district judge also instructed the jury on intentional second-degree murder and voluntary manslaughter as lesser included offenses of first-degree felony murder. Reed had requested, but was denied, instructions on unintentional second-degree murder and involuntary manslaughter.

Reed had also requested a voluntary intoxication instruction based on evidence of his intoxication and the intoxication of his brother. The district judge refused the request, saying, "[T]here was little to no evidence of—I would say no evidence of intoxication . . . . There certainly was evidence of drinking, that he had shots or beer. But there was no additional, no evidence to the level of intoxication."

The jury returned guilty verdicts on both first-degree felony murder and aggravated assault. The district judge sentenced Reed to life in prison for the felony murder and to a consecutive 18 months for the aggravated assault. The judge did not rule on the State's request for $5,000 in restitution during Reed's November 10, 2011, sentencing hearing because the defense sought additional time to review the State's documentation for the request. The judge agreed to leave the issue of restitution open and scheduled an additional hearing for December 16, 2011. Reed filed his notice of appeal

9

on November 16, 2011, while the issue of restitution was still pending in the district court. According to the district court record, the judge later filed an "Order Regarding Restitution."

JURISDICTION

We first briefly address the jurisdictional challenge raised by the State in its brief.

Relying on *State v. Hannebohn*, 48 Kan. App. 2d 921, Syl. ¶ 3, 301 P.3d 340 (2013), *abrogated by State v. Hall*, 298 Kan. 978, 319 P.3d 506 (2014), the State argues that a defendant's sentence is not final if restitution has been ordered but no amount has been set. According to the State, because the district judge's journal entry of judgment left the issue of restitution open, Reed's notice of appeal was premature and could not endow this court with jurisdiction.

"Whether appellate jurisdiction exists is a question of law over which this court exercises unlimited review." *State v. Looney*, 299 Kan. 903, 906, 327 P.3d 425 (2014).

In *Hall*, we rejected *Hannebohn* to the extent that "it implies that a notice of appeal filed before a restitution amount has been set presents an appellate jurisdictional bar to review of the amount." *Hall*, 298 Kan. at 988. Instead, this court held "that, in a criminal matter, where judgment is effective once pronounced from the bench, a premature notice of appeal that seeks review of a conviction and sentencing yet to be completed lies dormant until final judgment including the entire sentence is pronounced from the bench," at which point the notice of appeal becomes effective. 298 Kan. at 988.

10

At oral argument, the State conceded that *Hall* is the current controlling caselaw. The fact Reed filed his notice of appeal before restitution was finalized did not deprive this court of jurisdiction over Reed's appeal.

## MERGER OF AGGRAVATED BATTERY AND FELONY MURDER

Felony murder is the killing of a human being committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401(b). For felonies listed under subsection (b) of K.S.A. 21-3436, including aggravated battery, the felony must be "so distinct from the homicide alleged . . . as to not be an ingredient of the homicide alleged." Reed argues on appeal that the district judge erred by failing to instruct the jury that it must make a specific finding whether "the underlying felony of aggravated battery was so 'distinct from the homicide alleged . . . as to not be an ingredient of the homicide alleged.'" Without such a finding, he asserts, we cannot avoid the conclusion that the aggravated battery and the felony murder offenses merged.

Our review of a jury instruction issue follows a four-step progression:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" *State v. Story*, 300 Kan. 702, 710, 334 P.3d 297 (2014).

11

Reed does not cite any authority to support one of the supporting pillars of his argument on this issue, *i.e.*, that his suggested instruction was legally appropriate. He directs us to no precedent demonstrating that the question of whether a predicate felony is distinct from a homicide is one of fact for the jury rather than one of law for the court. Our research has revealed that, to the degree Kansas precedent exists, it defeats Reed's challenge. See *State v. Sanchez*, 282 Kan. 307, 316, 144 P.3d 718 (2006) (distinction between underlying aggravated battery, felony murder analyzed as legal question calling for interpretation of K.S.A. 21-3436[b][6]).

And we note that other jurisdictions have typically treated the question of merger as a question of law. See *Barnett v. State*, 783 So. 2d 927, 929 (Ala. Crim. App. 2000) (whether felonious assault resulting in victim's death merges with homicide treated as matter of law); *People v. Sarun Chun*, 45 Cal. 4th 1172, 1178, 203 P.3d 425 (2009) (certain crimes merge with felony-murder as matter of law); *People v. Morgan*, 197 Ill. 2d 404, 447, 758 N.E.2d 813 (2001) (whether forcible felonies merge with felony murder treated as question of law); *State v. Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006) (whether act causing willful injury merges with act that causes victim's death examined as matter of law).

Based on these authorities, Reed's jury instruction-based challenge is completely without merit. We need not reach the ultimate merits question of whether, as a matter of law, the aggravated battery here was "so distinct from the homicide alleged . . . as to not be an ingredient of the homicide." This question has not been raised before us. However, lest we encourage a later frivolous claim by way of a K.S.A. 60-1507 motion, we note that the fatal shooting of Barnes at close range by Robert was unquestionably distinct in method and in principal perpetrator from the beating being administered by Reed and Trout.

12

## SUFFICIENCY OF EVIDENCE FOR ALTERNATIVE MEANS

Reed attempts to challenge the sufficiency of the evidence to support both of the alternative means for felony murder, *i.e.*, the alternative underlying crimes of aggravated battery and possession of cocaine.

"In *State v. Timley,* 255 Kan. 286, 289, 875 P.2d 242 (1994), this court explained:

> """In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means."'

> "'Because jury unanimity is not required as to the means by which an alternative means crime is committed, unanimity instructions are not required in alternative means cases.' *Rojas-Marceleno,* 295 Kan. at 544 [, 285 P.3d 361 (2012)]. Nevertheless, the State must meet a 'super-sufficiency of the evidence' requirement, *i.e.*, present sufficient evidence to permit a jury to find each means of committing the crime beyond a reasonable doubt. *Rojas-Marceleno,* 295 Kan. at 544. If the State fails to present sufficient evidence to support each means, reversal is required. *Rojas-Marceleno,* 295 Kan. at 544." *State v. Newcomb,* 296 Kan. 1012, 1014, 298 P.3d 285 (2013).

Specifically, Reed asserts that the evidence was inadequate to demonstrate to the jury that the aggravated battery and the felony murder did not merge. We have explained above that Reed's argument in this regard rests on a categorization of the question as one for the jury rather than for the court. Merger raises a question of law, not a question of fact. Reed's challenge to the sufficiency of evidence on the alternative means of aggravated battery thus fails.

Regarding the alternative means of possession of cocaine, Reed's argument comes too late. He made no effort to challenge the sufficiency of the evidence in support of this alternative underlying felony in his brief, mentioning it only at oral argument before this court. The issue is thus deemed waived or abandoned. See *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 10, 303 P.3d 680 (2013) (failure to brief issues waives, abandons it).

LESSER INCLUDED OFFENSE INSTRUCTIONS

Reed next argues that the district judge should have instructed the jury on second-degree unintentional murder and involuntary manslaughter as lesser included offenses of felony murder.

This issue is without merit under current caselaw. *See State v. De La Torre*, 300 Kan. 591, 602, 331 P.3d 815 (2014). After the parties filed their briefs in this case, we decided *State v. Todd*, 299 Kan. 263, 278-79, 323 P.3d 829 (2014). In *Todd*, this court held that the legislature's amendment of the felony-murder statute to eliminate its lesser included offenses applied retroactively, "preventing appellate argument that a district court erred in failing to instruct on any lesser included offenses of felony murder." *De La Torre*, 300 Kan. at 602.

VOLUNTARY INTOXICATION INSTRUCTION

Reed's other challenge to the jury instructions focuses on the district judge's refusal to give a requested voluntary intoxication instruction.

A voluntary intoxication instruction is not required "[u]nless the State or the defendant presents sufficient evidence showing intoxication to the extent of impairing the ability to form the requisite intent." *State v. Betancourt*, 299 Kan. 131, 141, 322 P.3d 353

14

(2014). "'This court will not infer impairment based on evidence of consumption alone.'" *State v. Hilt*, 299 Kan. 176, 193, 322 P.3d 367 (2014) (quoting *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767 [2011]). "Loss of memory or inability to remember events before or during the offense may show an inability to form intent. See *State v. Minski,* 252 Kan. 806, 811-12, 850 P.2d 809 (1993)." *Betancourt*, 299 Kan. at 141. "[E]vidence that the defendant is so impaired that he or she has lost the ability to reason, to plan, to recall, or to exercise motor skills as a result of voluntary intoxication" can compel a jury instruction. 299 Kan. at 141-42.

In this case, Reed relies primarily on the evidence of alcohol consumption earlier in the evening. In addition, he argues that he "indicated that he did not remember where he went immediately after the offense in his interview with law enforcement." This argument is based on the testimony of the detective who interviewed Reed after he was arrested. But the detective's testimony, when read in context, does not support a significant failure of Reed's memory—alcohol-induced or otherwise. The detective said:

> "[Reed] comes down, gets in the Jeep. And they drive—they—he doesn't remember where they went, they went somewhere nearby and kind of sat there for a little []while, anticipated what should they do. Didn't know—at that point, he says he didn't know if [Barnes] had been hurt. And so they kind of thought out what they were going to do. And then, after a while, they went home."

In fact, this passage demonstrates that Reed apparently was able to remember what transpired at the unknown location. The evidence Reed relies on is not sufficient to establish anything beyond his mere consumption.

Reed also makes the further argument that, because the jury was instructed that he could be convicted as an aider and abettor, a voluntary intoxication instruction was warranted because of the intoxication and impairment of the principal, Robert. But we

need not reach the intriguing legal questions raised by this argument on the record of this case. As with the evidence on Reed himself, the evidence about Robert was limited to mere consumption. That was not enough to support a voluntary intoxication instruction.

VICTIM'S OUT-OF-COURT STATEMENTS

Reed also asserts three interrelated grounds for error in admitting Barnes' hearsay statements: (1) the district judge erred by concluding that the statements qualified as dying declarations; (2) the admission of a dying declaration violated Reed's confrontation rights; and (3) the district judge erred in admitting the statements as excited utterances because the hearsay exception's applicability does not excuse the reversible Confrontation Clause violation.

We review a district judge's decision on the admission of hearsay evidence for an abuse of discretion. *State v. Robinson*, 293 Kan. 1002, 1023, 270 P.3d 1183 (2012).

> "'Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, in other words, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]' *State v. Warrior,* 294 Kan. 484, 505, 277 P.3d 1111 (2012)." *State v. Burnett*, 300 Kan. 419, 436, 329 P.3d 1169 (2014).

If the issue is whether the trial court complied with specific statutory requirements for admitting evidence or whether an evidentiary ruling violated a defendant's constitutional rights, our review is de novo. *Robinson*, 293 Kan. at 1023.

16

As a preliminary matter, the State argues that Reed should be limited on appeal to his district court argument based on the Sixth Amendment. The State invokes *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) ("K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial.") and *State v. Bryant*, 272 Kan. 1204, 1208, 38 P.3d 661 (2002) (hearsay objections in district court inadequate to preserve Confrontation Clause argument for appeal).

We acknowledge that Reed's argument to the district judge centered on the Confrontation Clause, but the State raised the dying declaration and excited utterance issues in its motion supporting admission of Barnes' hearsay statements, and the district judge specifically discussed whether these exceptions had been satisfied in his ruling. At trial, Reed objected when Marceau began to testify about what Barnes had said to him. Reed's counsel said, "Because of prior hearings may I have a running objection[?]" This reference to prior hearings gave the district judge another opportunity to reconsider the pretrial rulings on all three grounds Reed advances on appeal. This satisfied one of the important purposes of the contemporaneous objection rule, and we are satisfied that Reed's trio of appellate hearsay arguments are preserved for our review.

Hearsay is any statement "which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 60-460. "The admissibility of hearsay is governed either by the federal and state Constitutions or by statute, depending on the type of hearsay at issue." *Robinson*, 293 Kan. at 1024. Typically the relevant constitutional law is that developed under the federal Sixth Amendment Confrontation Clause. It provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him [or her]." The Confrontation Clause bars admission of testimonial hearsay. *Michigan v. Bryant*, 562 U.S. 344, 354, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011); *Davis v. Washington*, 547 U.S. 813, 823-24, 126 S. Ct.

17

2266, 165 L. Ed. 2d 224 (2006); *Crawford*, 541 U.S. at 68; see also *Robinson*, 293 Kan. at 1024. Generally, if a statement is found to be testimonial "it must be excluded unless a court finds that the declarant is unavailable as a witness and that the defendant had a prior opportunity to cross-examine the declarant." 293 Kan. at 1024. Both the United States Supreme Court's Sixth Amendment jurisprudence and the applicable Kansas statute, however, recognize that dying declarations merit special handling. Under *Crawford*, the United States Supreme Court left open the possibility that a defendant's constitutional right to confront witnesses did not necessitate exclusion of a dying declaration. See *Crawford*, 541 U.S. at 56 n.6; *State v. Jones*, 287 Kan. 559, 566, 197 P.3d 815 (2008) (discussing *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 [2008] [statement that satisfies statutory requirement of dying declaration exception to hearsay prohibition admissible even if defendant has not had opportunity to cross-examine declarant]). Under K.S.A. 60-460(e), "[a] statement by a person unavailable as a witness because of the person's death [is admissible] if the judge finds that it was made (1) voluntarily and in good faith and (2) while the declarant was conscious of the declarant's impending death and believed that there was no hope of recovery."

Given the analytical equation of the federal constitutional and state statutory standards for which out-of-court statements qualify as dying declarations, Reed's brief focuses on whether there was an adequate factual basis for a finding that Barnes was conscious of his impending death and believed there was no hope of recovery at the time he made his statements. Barnes' voluntariness and good faith are unquestioned. According to Reed, testimony that Barnes "tried to sit up or stand up" shows Barnes to be something other than "[a]n individual who believes [he is] dying" because such an individual "would submit to care as opposed to trying to walk away from those who were providing medical care to him." Reed also notes that there was no testimony that police officers or emergency medical personnel explicitly informed Barnes that he was dying.

Reed's factual argument all but ignores the district judge's specific findings and his explicit references to the evidentiary support for them:

"Was [Barnes] conscious of his impending death and did he believe there was no hope of recovery? I look at Officer Newberry. He testified the facts of the situation when he discovered them, that when he—he heard a black male yell—what turned out to be a black male yelling for help. And [Barnes] would have been right under that person yelling for help, and so that would have added to the stress and added to the belief that he was about to die. There was blood on his abdomen. This is all from Newberry. There was blood on the floor and entry. The black male, the friend, was applying pressure. Vincent tried to get up. There's no question he was conscious. He was able to identify a .38 revolver and the name Mickey. He had difficulty speaking, difficulty breathing, he was coughing up blood, he was very 'panicked,' and he knew he had been shot. Officer Marceau confirmed all of that, but added that Vincent was on his knees at one point. He was swaying and staggering, trying to get up. There was blood coming out of the wound. Vincent specifically said 'I can't breathe' and also confirmed he was panicky. EMS—or the EMS Fahrenbruch . . . he said that he was writhing in pain and was in, quote, a lot of pain. That Vincent was very upset. Quote, pretty much hysterical. In 16 minutes from the dispatch, Vincent was Code Blue and died. So we have a very short time from gunshot to actual death. There appears to be no question in my mind that the facts support that he was conscious and very aware of his impending death and he had no hope of recovery."

We do not reweigh evidence on review, see *State v. Lewis*, 299 Kan. 828, 835, 326 P.3d 387 (2014), as Reed evidently expects. On the record before us, it cannot be said that the district judge's decision to allow testimony about Barnes' out-of-court statements as dying declarations was "arbitrary, fanciful, or unreasonable." Given this ruling, we need not discuss Reed's further argument about the Confrontation Clause or the Kansas statute on excited utterances.

CUMULATIVE ERROR

Reed's final argument on appeal is that cumulative error requires reversal of his convictions. Because we have not identified multiple errors, the doctrine of cumulative error analysis is inapplicable. See *State v. Cameron*, 300 Kan. 384, 400, 329 P.3d 1158 (2014).

CONCLUSION

Defendant Michael Reed's convictions and sentences for first-degree felony murder and aggravated assault are affirmed.