IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,143

STATE OF KANSAS,
*Appellee*,

v.

JASON L. RUCKER,
*Appellant*.

SYLLABUS BY THE COURT

1.

When a defendant challenges the sufficiency of the evidence of an alternative means crime, sufficient evidence must support each alternative means charged to ensure that the verdict is unanimous as to guilt.

2.

When reviewing for sufficiency of the evidence, an appellate court does not reweigh the evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.

3.

A party must make a specific and timely objection at trial to preserve evidentiary issues for appeal.

Appeal from Wyandotte District Court; DELIA M. YORK, judge. Opinion filed June 7, 2019. Affirmed.

*Jeffrey C. Leiker*, of Leiker Law Office, P.A., of Kansas City, argued the cause and was on the brief for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.,* district attorney, *Jennifer S. Tatum*, assistant district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Jason Rucker appeals his conviction for first-degree murder. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 22, 1997, Celestino Zavala Ruiz went to V.E.'s house in Kansas City, Kansas. The two were dating and Zavala wanted to ask V.E. out for coffee. When Zavala arrived, the door to the house was unlocked. He went inside and immediately noticed that the television was missing. Zavala found V.E.'s body in the bedroom and immediately called the police.

When officers arrived at V.E.'s home, they found her body lying on the bed. V.E. was unclothed from the waist down. Her bra had blood stains on it and appeared to have been torn in several places. V.E.'s hands and feet were bent behind her and tied together with rope. There was a rope wrapped around her neck, pulled back, and tied around her hands. V.E.'s throat had been cut and her head showed signs of blunt force trauma. Investigators observed that it looked like the house had been "ransacked." Drawers had been pulled out and scattered around the floor, and it appeared someone had dumped the contents out of a purse. Officers found a hammer in the kitchen closet.

2

A coroner conducted an autopsy and used a sexual assault kit to collect DNA evidence from V.E.'s body and clothes. The coroner observed that V.E. had two different "crush lacerations" on her head, a skull fracture, a 6-inch cut along her throat, a stabbing injury that went through the neck, abrasions on her knees, and wounds on her hands. The coroner concluded that V.E. died as a consequence of blunt trauma to the head and a stab wound to the neck and that her death was a homicide.

The Kansas Bureau of Investigation (KBI) began testing the physical evidence from V.E.'s body and the crime scene in 2001. Preliminary testing revealed semen on the vaginal swab and on several items—a quilt, a pair of pantyhose, a jacket, and a pair of pants. There was also blood on the head of the hammer and DNA evidence on some cigarette butts found in the house. Further testing revealed Zavala's DNA on two of the cigarette butts. There was a different and unknown male DNA profile discovered in the semen on the vaginal swab and on one of the cigarette butts. A second unknown male DNA profile was found in the semen on the jacket and the semen on the quilt. There was a third unknown male DNA profile found in the semen on the pants and the semen on the pantyhose. And there was a fourth unknown male DNA profile found on another one of the cigarette butts.

The KBI entered the DNA profiles of the four unknown males into CODIS, a database that collects and compiles DNA evidence. In 2006, the DNA profile found in the semen on the vaginal swab and on one of the cigarette butts matched with a DNA profile belonging to Torry Johnson. In 2010, CODIS matched the DNA profile found in the semen on the jacket and the quilt with Rucker's DNA.

In March 2015, investigators interviewed Johnson. Johnson told them that on the day of V.E.'s death, he, Rucker, and a man named Jesus had been at V.E.'s house. Johnson admitted that they had planned to rob V.E. and that they had tied her up, Rucker

had raped her, and they had taken her television. He told investigators that Jesus had then slit her throat.

In July 2015, the State charged Rucker with first-degree felony murder. Johnson was also charged and convicted of V.E.'s murder in a separate case.

At Rucker's trial, Johnson testified for the State. He described the events leading up to V.E.'s death differently than he had in his original interview with investigators. Johnson testified that he, Rucker, and Jesus had gone to V.E.'s house and agreed to sell her some drugs in exchange for sex and her television. According to Johnson's testimony, V.E. had consensual sex with him and Johnson and then Johnson took the television out to the car. Johnson testified that V.E. then realized some of the drugs were not real and began demanding they return her television and leave. Johnson began punching her, Jesus hit her in the head with a hammer, and Johnson dragged her to the bedroom and tied her up. Jesus cut her throat with a knife and the men joined Rucker in the car and left.

After Johnson testified to all of this, the State played Johnson's original statement for the jury. This statement is not in the record on appeal. But Johnson confirmed some of its content through the State's questioning. Johnson admitted that he originally told investigators "from the get-go it was a plot for robbery" and that he had been "scoping out" V.E.'s house and had seen the television. Johnson confirmed that he told investigators V.E. told him to leave after discovering he had no drugs and at that point, he tied V.E.'s hands in front of her and Rucker dragged her to the bedroom and raped her. Johnson acknowledged that during the interview the investigators stated "and then you and [Rucker] take the TV out of the room and take it, physically, both of you, to the car," and then asked Johnson, "How much time is there between you and Jason carrying the TV out and Jesus killing her and hogtying her? How does that happen?" Johnson confirmed that he replied, "[I]t wasn't that much time at all."

4

Johnson testified that he sent Rucker a note while he was in prison at some point after V.E.'s death. Johnson confirmed that in the note he wrote that the State was going to play them against one another and suggested that they should "plead the Fifth against the other and say the plan was to pay for sex and then Torry trips, Jason leaves and Torry puts her down." Johnson admitted that he was going to lie and take the blame for killing V.E. because he was already going to prison for life and Rucker had a family.

The trial court instructed the jury on felony murder and told it that to prove Rucker's guilt, the State had to find that Rucker or another killed V.E. and that "such killing was done while the defendant was committing or attempting to commit or in flight from committing a felony, to wit: robbery, rape, aggravated kidnapping and/or aggravated burglary." It provided no unanimity instruction. The trial court also instructed the jury on aiding and abetting.

The jury found Rucker guilty of first-degree felony murder. The district court sentenced him to life imprisonment without the possibility of parole for 15 years. Rucker appealed his conviction to this court.

ANALYSIS

Rucker challenges the sufficiency of the evidence supporting the felony-murder conviction.

When a defendant challenges the sufficiency of the evidence supporting a conviction, we "review[] the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Lowery*, 308 Kan. 1183, 1236, 427 P.3d 865 (2018) (quoting *State v.*

5

*McClelland*, 301 Kan. 815, 820, 347 P.3d 211 [2015]). We will not "reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. . . . [T]here is no distinction between direct and circumstantial evidence in terms of probative value." *Lowery*, 308 Kan. at 1236 (quoting *McClelland*, 301 Kan. at 820). We have also held that "'[a] conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.'" *Lowery*, 308 Kan. at 1236 (quoting *McClelland*, 301 Kan. at 820).

When a defendant challenges the sufficiency of the evidence of an alternative means crime, "sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt." *State v. Butler*, 307 Kan. 831, 841, 416 P.3d 116 (2018) (citing *State v. Brown*, 295 Kan. 181, 188, 284 P.3d 977 [2012]). An alternative means crime is one that can be committed in more than one way. *State v. Reed*, 302 Kan. 390, 399, 352 P.3d 1043 (2015) (quoting *State v. Rojas-Marceleno*, 295 Kan. 525, 544, 285 P.3d 361 [2012]).

Felony murder is "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony . . . ." K.S.A. 21-3401(b) (Furse).

The State alleged that V.E. was killed while Rucker was "in the commission of" or "attempt to commit" one or more of the following inherently dangerous felonies: robbery, rape, aggravated kidnapping, and aggravated burglary. See K.S.A. 21-3436(a)(2), (3), (5), (10) (Furse). Because the State based the charge on four possible felonies, it was an alternative means crime and there must be sufficient evidence to support a finding that Rucker committed each of the underlying felonies.

The relevant statutory language of these felonies, in accordance with how the jury was instructed, is as follows:

"Aggravated burglary is knowingly and without authority . . . remaining within any building . . . in which there is a human being, with intent to commit a felony, theft or sexual battery therein." K.S.A. 21-3716 (Furse).

"Robbery is the taking of property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-3426 (Furse).

"Aggravated kidnapping is kidnapping . . . when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-3421 (Furse). "Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person: . . . (b) to facilitate flight or the commission of any crime." K.S.A. 21-3420 (Furse).

"Rape is (1) Sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances: (A) When the victim is overcome by force or fear . . . ." K.S.A. 1997 Supp. 21-3502.

The jury was also instructed on aiding and abetting. Under this statute, "[a] person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." K.S.A. 21-3205(1) (Furse).

Rucker asserts that the evidence shows he had consensual sex with V.E. and then left before any alleged robbery, kidnapping, or murder occurred. Based on this, he claims that the State failed to offer sufficient evidence to support any of the underlying felonies.

7

Rucker failed to include all of the evidence in the record on appeal—the record does not contain Johnson's original statement to investigators or the letter he sent to Rucker. In spite of this failure, we conclude there is sufficient evidence to support the convictions.

We know from trial testimony that Johnson originally told investigators "from the get-go it was a plot for robbery" and "we was scoping out the place." He also told them that V.E. got mad when "we tried to hurt her and take her stuff." Johnson stated that he and Rucker tied V.E. up and eventually took her television out of her house and to the car.

Johnson also told investigators that he tied V.E.'s arms in front of her and that Rucker then dragged her to the bedroom and raped her. There was semen on a jacket and a quilt found in V.E.'s bedroom. The DNA profile in the semen matched the profile in Rucker's DNA. V.E. appeared to have defensive wounds on her body.

Although Johnson's trial testimony contradicted some of this evidence, we do not "reweigh the evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Brown*, 298 Kan. 1040, 1054-55, 318 P.3d 1005 (2014).

When the evidence is considered in the light most favorable to the State, it is sufficient to support a jury finding that Rucker committed aggravated burglary, robbery, rape, and aggravated kidnapping. Consequently, Rucker's challenge fails.

*Admission of Photographs*

Rucker argues that the district court erred when it admitted at trial pictures of V.E. because those pictures were "grisly and repulsive and were only showing facts that were not in dispute." He further asserts that "[t]hey had no probative value on the issues that were in dispute at trial" and "[t]hey only went to inflame the passions of the jury." Rucker asserts that their admission requires "reversal."

We do not reach the merits of Rucker's argument because he has not preserved it for appeal.

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404.

Under this rule, a party must "make a specific and timely objection at trial in order to preserve evidentiary issues for appeal." *State v. Brown*, 307 Kan. 641, 645, 413 P.3d 783 (2018).

At trial, the State offered photographs of the scene of the crime and Rucker's autopsy. Rucker did not object to the admission of any of the photographs. In fact, he stipulated to their admission.

Because Rucker did not object to the photographs, the propriety of their admission is not properly before us. We decline to address the merits of Rucker's claim.

Affirmed.

9

LUCKERT and JOHNSON, JJ., not participating.

KAREN ARNOLD-BURGER, Chief Judge of the Kansas Court of Appeals, assigned.[1]

MICHAEL J. MALONE, Senior Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:**  Chief Judge Arnold-Burger, of the Kansas Court of Appeals, was appointed to hear case No. 117,143 vice Justice Luckert under the authority vested in the Supreme Court by K.S.A. 2017 Supp. 20-3002(c).

[2]**REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 117,143 vice Justice Johnson under the authority vested in the Supreme Court by K.S.A. 20-2616.

10