NOT DESIGNATED FOR PUBLICATION

No. 121,242

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.C.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed December 13, 2019. Affirmed.

*Stuart N. Symmonds*, of Symmonds & Symmonds, LLC, of Emporia, for appellant natural father.

*Meghan K. Morgan*, assistant county attorney, and *Marc Goodman*, county attorney, for appellee.

Before GARDNER, P.J., BUSER, J., and LAHEY, S.J.

PER CURIAM: B.C. (Father) appeals the termination of his right to parent A.C. He argues there was insufficient evidence to support the termination of his parental rights, and he contends the district court erred by admitting hearsay evidence at the termination hearing. Finding no error, we affirm the district court.

FACTUAL AND PROCEDURAL BACKGROUND

Father and A.K. (Mother) are the natural parents of A.C. Tragically, while pregnant with A.C., Mother was in a car accident which left her in a vegetative state. A.C. was born in April 2014 while Father was in prison for an aggravated assault conviction. A.C.'s grandparents cared for him for most of his first year. After his release from prison, until this case was filed, Father had been the primary caretaker for his son.

1

The November 3, 2017 petition alleged that A.C. was a child in need of care on the grounds of physical neglect. At the initial temporary custody hearing four days later, Father appeared without counsel. A.C. was put in the temporary custody of the Kansas Department for Children and Families (DCF) and placed with Father's parents.

A week later, after Father retained counsel, the district court held a second temporary custody hearing. At the hearing, witnesses testified about their concerns regarding A.C., which included his being dropped off at pre-school/daycare on November 2, 2017, by a man unknown to the school officials. A.C. smelled of urine; had dried feces on his legs; his pants, underwear, and socks were damp with urine; and he had a severe diaper rash. Unable to reach Father, the school ultimately contacted A.C.'s paternal grandfather to pick him up from school. Late that afternoon, Father came to the school to pick up A.C. and, after some confusion, learned that A.C. was with his grandfather. School officials testified to their concerns that Father was fidgety and acted in such a way that there was concern he was under the influence of drugs. Father testified that anything out of the ordinary about his behavior was not caused by drugs but by concern for his son.

At the conclusion of the temporary custody hearing, the district court ordered that A.C. remain in DCF custody and continued his placement with Father's parents. An adjudication hearing was scheduled for December 14, 2017. At the conclusion of both temporary custody hearings, the district court directed Father to report to court services and submit a urine sample for analysis. Father did not comply with either court order.

On the day of the adjudication hearing, although his attorney was present, Father did not appear. The district court found that A.C. was a child in need of care pursuant to K.S.A. 2018 Supp. 38-2202(d)(1), (d)(2), and (d)(3). At the dispositional hearing on January 16, 2018, Saint Francis Community Services (SFCS) caseworkers presented a plan with the goal of reintegrating A.C. into Father's custody. The plan required Father to

meet various objectives designed to impart skills so he could adequately parent and meet the needs of A.C. Father did not appear at the dispositional hearing and did not participate in the development of the case plan. The case plan contained the following tasks for Father:

1. Obtain a drug and alcohol evaluation and follow recommendations for treatment.
2. Submit to random urinalysis (UA) tests or mouth swabs.
3. Allow background checks for individuals who would spend significant time with A.C.
4. Complete a parenting assessment and psychological evaluation and follow recommendations.
5. Maintain housing, utilities, and employment and allow a walkthrough of Father's residence by SFCS.

Multiple permanency hearings were held over the course of a year to review Father's progress in completing these tasks. Ultimately, the district court determined that reintegration was no longer a viable option, and the State filed a motion to terminate Father and Mother's parental rights. After the motion was filed but before the termination hearing, Father was arrested for taking A.C. from his placement without permission. The termination hearing was held on February 26, 2019. Multiple caseworkers testified about Father's failure to complete case plan tasks, his behavior and failure to communicate with caseworkers, and his recent incarceration. Father also testified and denied many of the caseworkers' claims that he did not complete case plan tasks.

After making factual findings, the district court addressed the conflicting stories between caseworkers and Father and found that Father was not credible. The district court held Father was unfit based on his failures to comply with the case plan tasks. The district judge added, "[H]e's had ample time to change, he's had ample opportunity to

3

change and because of his intellectual or mental disabilities that he has he's not able to change, so [Father's unfitness is] unlikely to change in the immediate future or any time in the future."

Father timely filed this appeal. Mother does not appeal.

I.     DID THE DISTRICT COURT ERR IN TERMINATING FATHER'S PARENTAL RIGHTS?

A parent has a constitutionally protected liberty interest in the relationship with his or her child. *In re R.S.*, 50 Kan. App. 2d 1105, 1115, 336 P.3d 903 (2014); see *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the law considers this right to be fundamental. The State may therefore extinguish the legal bonds between parent and child only upon clear and convincing evidence of parental unfitness. K.S.A. 2018 Supp. 38-2269(a).

Under the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq. (the Code), the State must prove the parent to be unfit "by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a). The statute contains a nonexclusive list of nine conditions that singularly or in combination constitute unfitness. K.S.A. 2018 Supp. 38-2269(b). Four additional factors are to be considered by the court when a parent no longer has physical custody of a child. K.S.A. 2018 Supp. 38-2269(c).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at

4

705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. Thus, we resolve any conflicts in the evidence in favor of the State and against Father and defer to the trial court's determination as to the credibility of witnesses.

A. *There is clear and convincing evidence to support the district court's finding that Father failed to carry out a reasonable plan directed toward integrating the child into the parental home.*

Here, the district court did not enumerate a specific statutory provision for its determination that Father was unfit. In its oral findings, the district judge stated, "[B]ased upon the findings and failures to comply with the case plan tasks, the Court would find that he's unfit." Likewise, the written journal entry does not enumerate a statutory provision either but mirrors the district court's language from the bench. From the transcript and the journal entry of the termination hearing, it is apparent that the district court was relying on K.S.A. 2018 Supp. 38-2269(c)(3), which states that when a child is not in the custody of a parent, the court shall consider the parent's "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." The district court's finding that Father failed to carry out a reasonable plan directed toward reintegration was supported by the evidence, which showed that in the time between DCF's intervention and the termination hearing Father failed to complete most of the reintegration tasks.

Before reviewing each of the case plan tasks, we note Father contended he was never granted an adjudication hearing by the district court and was never provided with any case plan. He testified, "I never knew of any case plans. I never even knew it was a child in need of care case until this trial because we never got [an] adjudication hearing." The record plainly reflects Father appeared for the temporary custody hearings and was

5

advised of the time and date of the adjudication hearing. It further shows that the hearing was scheduled and held and that Father failed to appear for it.

As to the case plan, Father testified he never knew about any case plan even though he asked for one "all the time." The SFCS licensed permanency specialist assigned to work with Father testified that every month—February through September 2018—she attempted to review the case plan tasks with Father. She described him as easily agitated and hot-headed; he would "become loud, clench his fists, and continually ask why we effing kidnapped his child." She also testified her interactions with Father did not last long because Father would get agitated and leave.

SFCS held three case plan meetings, and Father did not attend any of them. The SFCS reintegration supervisor testified she personally made Father aware of the case plan tasks he needed to complete to get his son back. She testified Father had issues with every SFCS worker with whom he had contact, and she believed Father was struggling emotionally and needed mental health services.

The case reintegration plan required Father to complete a drug and alcohol evaluation and follow any recommendations for treatment. Caseworkers at SFCS testified, and Father admits, that he never obtained a drug and alcohol evaluation. Father explained that he had not completed it because no one ever got back to him about it and he was unaware he was supposed to schedule it. Father also admitted that he used marijuana on a trip to Colorado. The SFCS worker assisting Father said she made two referrals for the evaluation and Father failed to follow up and obtain the evaluation.

Under the case plan, Father was to submit to random UA tests or mouth swabs and any failure to adhere to these requests was considered a positive result. Caseworkers testified that Father completed only two out of seven SFCS requested mouth swabs throughout this case. Caseworkers testified that other undocumented requests for testing

were made and refused. They further testified additional mouth swabs would have been requested but for the difficulty in contacting Father. In addition to his refusing five mouth swab requests, Father admitted that he refused to submit to two court-ordered drug screens.

Father was also required to complete a parenting assessment and a psychological evaluation and follow any recommendations. Father partially complied with this task. He participated in an intake assessment with an outpatient therapist at Crosswinds Counseling. She testified that her October 2018 recommendation following the intake was for Father to engage in individual therapy and medication management. SFCS caseworkers testified that Father had provided no documentation that he was attending the recommended mental health services. Crosswinds documentation reflected that Father had not been attending mental health counseling. Contrary to the State's evidence, Father testified he met with an intern therapist at Crosswinds just before his most recent incarceration and that the counselor continued to have appointments with him while he was in jail.

Father was to maintain housing, utilities, and employment. Father also was to allow SFCS to complete a walkthrough of his home. A SFCS caseworker testified that Father would not allow her into his home and refused to complete a walkthrough. On one occasion, Father yelled at her and told her the only way she would be allowed in his house was if she brought a news channel with her so that she could explain why she kidnapped his child. On another occasion, SFCS scheduled a walkthrough, but Father was not there when caseworkers arrived. Father testified that he never refused a walkthrough of his home but cancelled one because he was sick. When asked about his willingness to allow a walkthrough of his house by SFCS, Father testified he had been trying to get SFCS to come to his house for a walkthrough but he could not get anyone to do it. SFCS never received any verification of Father's employment. Father testified that

he was employed most of the time but admits he did not provide proof to SFCS because he did not know he needed to do so.

Caseworkers testified that Father was not allowed to have unsupervised visits and most visits took place at the home of Father's parents. Visits between Father and A.C. were supervised by family members instead of SFCS because of Father's poor behavior around caseworkers and his refusal to come to the office for visits. Father's current caseworker testified that on January 20, 2019, Father took A.C. from the home of Father's parents, where A.C. was placed, without permission. A.C. was gone for around three hours, and law enforcement was contacted due to the incident. Father testified that he was arrested and charged with interference with child custody and violation of a protection order. He was still in jail at the time of the termination hearing but expected to be released in less than a month.

Caseworkers testified at length regarding Father's behavior and lack of communication with them. Father's intake caseworker testified that Father refused to do any of the initial paperwork and refused a mouth swab. Father made no effort to arrange visitation with A.C. between the first temporary custody hearing until after the dispositional hearing. One caseworker testified when she sought to set up visits with A.C., she reached out to Father at least four times with no response. Another time Father told her it was not a good day for a visit, and at least once Father cancelled the visit an hour before it started. Father eventually told this caseworker he did not want to work with her because she did not have a degree and was not educated enough. The caseworker testified that she was concerned for her personal safety while working with Father because he got upset easily and lashed out at her by yelling and screaming. Father's next caseworker testified that Father would get agitated and upset when she would try to talk to him about case plan tasks. He would become loud, clench his fists, and continually ask her why they kidnapped his child.

Multiple witnesses also testified about the relationship between Father and A.C. Notably, SFCS caseworkers testified that Father's relationship with A.C. was strong and the two got along well. Father testified that before A.C.'s removal from his home, he provided care for A.C. and the pair would go to the park, play in the yard, and go fishing together. A.C.'s paternal grandfather told the SFCS caseworker that Father and A.C. were more like siblings than father and son—they were on each other's level and it was like they were just two kids playing together.

Father's testimony at the termination hearing centered on his assertion that he never saw a case plan, he did not think there was a case plan, and he believed caseworkers kept adding to the case plan to get more time. Father also asserted he was not allowed an adjudication hearing, and he denied all initial allegations which led to A.C.'s removal.

Father's testimony was contrary to that provided by SFCS caseworkers on almost all points of contention. Father disputed or sought to excuse his lack of participation in meeting case plan tasks, but the district court found that Father's testimony was not credible. The district court noted that "[Father's] testimony was somewhat disjointed and confusing at times, [and] quite frankly, not based on reality." In part, Father is now asking us to consider as true his testimony disputing most claims, which we cannot do. See *In re B.D.-Y.*, 286 Kan. at 705.

Based on the testimony of caseworkers and in light of the district court's determination that Father's testimony was not credible, there is clear and convincing evidence to support the district court's determination that Father failed to carry out a reasonable plan directed toward integrating the child into the parental home. Father did not complete most of reintegration tasks, Father often refused to cooperate with caseworkers, and he made it difficult to work with caseworkers due his aggressive behavior. In sum, based on a review of the full evidentiary record considered in a light

9

favoring the state, a rational fact-finder could determine to a high probability that Father was unfit to parent A.C.

Additionally, there is support for the district court's determination that Father's unfitness was unlikely to change in the foreseeable future. "The 'foreseeable future' should be viewed from the child's perspective, not the parents'." *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008). Recognizing that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, the Code encourages a prompt, permanent disposition. See K.S.A. 2018 Supp. 38-2201(b)(4). Here, that factor takes on particular significance given the young age of A.C. who has been in the custody of someone other than a parent for almost two years of his life.

The evidence showed that Father did not complete the bulk of his case plan tasks, he continuously refused to work with SFCS, and he continued to resist cooperation because he believed the caseworkers kidnapped his child. Notwithstanding nearly a year of interaction with SFCS, Father, by his own testimony, did not recognize until the hearing that this was a child in need of care proceeding. While Father testified he would cooperate in the future, he also testified he had been willing to cooperate all along. The district court clearly articulated its view that Father's testimony was not credible, was confusing, was contradictory, and was not based on reality. We find the district court's determination that Father's unfitness was unlikely to change in the foreseeable future to be supported by the evidence.

B. *The district court did not abuse its discretion in finding that termination of Father's parental rights was in the best interests of the child.*

In his brief on appeal, Father argues that the district court failed to find that termination of Father's rights was in the best interests of A.C. The district court must find

10

termination of parental rights "is in the best interests of the child [and] shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1). The district court makes that decision within its sound discretion, based on a preponderance of the evidence, and an appellate court reviews the district court's decision for an abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. A district court exceeds that broad latitude if its ruling is unreasonable or is based on an error of law or fact. *Northern Natural Gas Co., v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 571 U.S. 826 (2013).

Here, the district court did not specifically address "best interests" in its oral ruling, but the finding was made in the court's journal entry. See *In re B.E.Y.*, 40 Kan. App. 2d 842, Syl. ¶ 3, 196 P.3d 439 (2008) (finding K.S.A. 2007 Supp. 38-2269[g][1] directs court to consider best interests of child and "[t]he better practice is for the district court to reflect in its journal entry that it has considered the best interests of the child" in its determination). The journal entry specifically states—twice—that termination was in the best interests of A.C.:  "The Court finds that it is the best interest of the child to terminate the natural father's rights"; and "Considering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of the child . . . and the physical, mental or emotional needs of the child would be best served by termination of parental rights."

A preponderance of the evidence supports the district court's finding that termination is in the best interests of A.C. In addition to the facts and findings set forth above, the district court observed that Father's mental health evaluation is "enlightening because it says he may not have the ability to recognize a basic child growth and development discipline and those sort of things related to childrearing and nurturing skills necessary to raise a child or establish appropriate boundaries between a child and a parent." Over the course of this case, Father failed to address the concerns raised in the

11

evaluation and those concerns bear directly on A.C.'s best interests as they impact his physical, mental, and emotional needs and health.

The district court's determination is supported by clear and convincing evidence, and we find no abuse of discretion.

II.     DID THE DISTRICT COURT ADMIT INADMISSIBLE HEARSAY?

At the termination hearing, a DCF investigator testified about DCF's process during the initial investigation of the reports concerning A.C. and Father. She referred to evidence presented and witness statements admitted in evidence at the temporary custody hearing. Father's counsel objected to the testimony at various points, arguing the testimony was hearsay.

Hearsay is "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2018 Supp. 60-460. "This court reviews a trial court's determination that hearsay is admissible under . . . an abuse of discretion." *State v. Miller*, 284 Kan. 682, 708, 163 P.3d 267 (2007). We conduct a de novo review of whether the district court complied with statutory requirements for admitting evidence. *State v. Reed*, 302 Kan. 390, 402, 352 P.3d 1043 (2015).

In his brief, Father does not identify the specific information the investigator relayed which he considers to be hearsay. In three instances, in ruling on Father's hearsay objection, the district court found the evidence was not offered to prove the truth of the matter. Instead, it found the investigator was testifying to the process DCF undertook or explaining why she subsequently did something. In his brief, Father simply asserts "the statements were offered for the truth of the matter" without identifying any specific evidence that constitutes the offending hearsay. Furthermore, Father does not explain

12

how or why the trial court's ruling was incorrect and does not specify any particular relief being sought. Typically, issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). We find Father's general hearsay argument is not adequately briefed and is insufficient to frame the issue for review.

In response to several other hearsay objections, the State responded that "all this information is contained in the court's file" and requested the district court take judicial notice of the court file. Father did not, and in his brief does not, challenge the propriety of the court taking judicial notice of the court file nor does he argue any of the testimony went beyond the information in the file.

After the district court noted that it did not recall any objections to reports being made part of the court file at the time of the previous hearings, the district court found that because the reports were part of the record, it could take judicial notice of those reports. The district court was correct. See K.S.A. 60-409(b)(4); *In re A.S.*, 12 Kan. App. 2d 594, 598, 752 P.2d 705 (1988). Because the investigator testified about information already part of the court file, the district court did not have to admit his testimony under a hearsay exception. We find no error in the district court's evidentiary rulings.

We find the district court acted within the evidence and the law in terminating Father's parental rights to A.C. and affirm the district court.

Affirmed.