IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,871

STATE OF KANSAS,
*Appellee*,

v.

ALEX DEE DAVIS,
*Appellant.*

SYLLABUS BY THE COURT

1.

K.S.A. 2019 Supp. 8-1568(b)(1) and (b)(2) set out material, distinct elements for committing the felony form of felony fleeing or eluding a police officer.

2.

Under K.S.A. 2019 Supp. 8-1568(b)(2), the crime occurs when the driver subjectively intends to avoid capture for a felony.

3.

A pretrial objection concerning evidence admissibility must be contemporaneously renewed during trial or otherwise made subject to a standing objection to preserve the admissibility issue for appellate review.

4.

Law enforcement's duty to scrupulously honor a suspect's decision to invoke *Miranda* rights requires the suspect to communicate that decision without ambiguity or equivocation.

1

5.

Evidence is relevant if it has any tendency in reason to prove any material fact. To establish relevance, there must be some substantial or logical connection between the asserted facts and the inference or result they are intended to establish.

6.

A party being limited by the exclusion of evidence must sufficiently proffer the substance of that evidence to preserve the issue for appeal.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed October 23, 2020. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  Following a string of property crimes earlier in the day, Alex Davis fled from a traffic stop and collided with another vehicle, killing the driver. A jury convicted him of first-degree felony murder, leaving the scene of an accident, felony fleeing or attempting to elude a police officer, felony and misdemeanor theft, and driving with a suspended license. He claims several trial errors and one sentencing error in this direct appeal. We affirm his convictions and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

A man covering his face with a red bandana and wearing skeleton gloves entered a Wichita donut shop's back door early on October 24, 2016. The man pointed a "rainbow colored" gun at an employee and demanded money. He left without taking anything.

Sometime between 7:40 a.m. and 12:20 p.m. that same day, someone forced their way inside a west Wichita home and took jewelry, electronics, and a gray Volkswagen Jetta. Across the street at another house other items were taken, including a high school class ring and some watches, after a forced entry.

Around noon, Wichita police officer Amber McClure saw the Volkswagen, driven by Alex Davis, run a stop sign. To McClure, this appeared to be just a regular traffic stop. She activated her body camera and turned to pull the car over. But Davis sped up, so she activated her patrol car's lights and siren in pursuit. Davis ran a red light and T-boned another vehicle's passenger side. An accident reconstruction expert testified Davis was travelling about 70 miles per hour at impact. The other vehicle's driver, James Dexter, was taken to the hospital where he died a few hours later from injuries caused by the crash.

Davis fled the Volkswagen on foot. He dropped a pink and purple gun and a black glove with a skeleton design. He had earrings, rings, necklaces, and a men's watch in his pocket when apprehended. Inside the Volkswagen, police found a glove matching the one Davis dropped, a gun magazine, electronics, and other items taken from the burgled homes.

When interviewed by detective James Bray, Davis admitted knowing he was being pulled over and said he fled because he thought he had an outstanding warrant and a

suspended driver's license. He admitted driving 75 to 80 miles per hour and said he could not stop for the red light because he was going too fast. Later, while being taken to jail, he made more incriminating remarks to Officer Pat Mulloy. Davis said, "[I]t was either going to go down like this or I was going to shoot someone." He confirmed the skeleton gloves and gun were his and in his possession for several days. But he claimed he woke up at 11 a.m. at a friend's mom's apartment, where a man named Oscar gave him the Volkswagen key and offered him a gold ring and cash in exchange for pawning some property for him.

The State filed an 11-count complaint alleging crimes arising from the donut shop robbery attempt, the home intrusions, the subsequent traffic infractions, and Dexter's death. A jury acquitted Davis of the attempted donut shop robbery and two burglary counts. It convicted him of the remaining crimes.

The district court sentenced Davis to a hard 25 life sentence for the felony murder. It also sentenced him to consecutive terms totaling 86 months for the remaining convictions, except the license violation, for which it sentenced him to a concurrent six-month term. The court ordered these sentences to run consecutive to the sentences in two other cases from Sumner County and Sedgwick County. The court dismissed the second-degree murder conviction and the felony fleeing and eluding conviction in count four (based on evading capture for a felony) but stayed dismissal pending disposition on appeal.

Davis timely appeals. He raises several issues tied to his convictions, which we consolidate into six: (1) whether the felony-murder conviction must be reversed because insufficient evidence supports one of the alternative means of committing the crime's underlying felony—fleeing or attempting to elude police; (2) whether his incriminating statements were inadmissible because police ignored his invocation of the right to remain

4

silent; (3) whether his statement that "it was either going to go down like this or I was going to shoot someone" was inadmissible since it was irrelevant and unduly prejudicial; (4) whether he should have been permitted to introduce evidence of the victim's medical treatment decisions to establish an intervening cause of death; (5) whether the prosecutor shifted the burden of proof in voir dire by asking prospective jurors to agree they would "not . . . hold it against either side for something that I didn't get"; and (6) whether cumulative error denied him a fair trial. He also raises a sentencing issue over a claimed 599 days of jail credit time.

Jurisdiction is proper. K.S.A. 2019 Supp. 22-3601(b)(3), (4).

ALTERNATIVE MEANS

Davis argues the felony-murder instruction contained alternative means of committing the crime because it permitted the jury to convict him if it found he killed Dexter while committing either of two distinct forms of felony fleeing and eluding. He claims the felony-murder conviction must be reversed because insufficient evidence supported a conviction for fleeing to avoid capture for a felony. See *State v. Cottrell*, 310 Kan. 150, 157, 445 P.3d 1132 (2019) ("In 'an alternative means case, . . . sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt.'").

Davis advances two seemingly distinct arguments, but we combine them into one since the sufficiency challenge is only legally significant for the alternative means argument. This is because the jury convicted him of both forms of fleeing and eluding, and at sentencing the district court dismissed the count he claims lacked sufficient evidence. The only remaining practical impact on Davis is whether alternative means provided a pathway for the jury's felony-murder verdict.

5

To succeed on this claim, Davis must demonstrate: (1) the two felony fleeing and eluding theories were alternative means of committing felony murder; and (2) there was insufficient evidence to support one of those means. See *Cottrell*, 310 Kan. at 157. If he fails on either, his challenge fails. As explained, we agree with the first contention, but not the second. We hold sufficient evidence supports both alternative means alleged for committing felony murder.

*Additional facts*

In the felony-murder jury instruction, the court told the jury:

"In count one the defendant is charged with murder in the first degree. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

"One, the defendant killed James Dexter. Two, *the killing was done while the defendant was committing fleeing or attempting to elude an officer*. Three, this act occurred on or about the 24th day of October, 2016, in Sedgwick County, Kansas. The elements of fleeing or attempting to elude an officer are listed in instruction numbers nine and 10." (Emphasis added.)

In the fleeing and eluding instructions, the court first told the jury:

"In count three the defendant is charged with fleeing or attempting to elude a police officer. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved: One, the defendant was driving a motor vehicle. Two, the defendant, as given – that should be was – the defendant was given a visual or audible signal by a police officer to bring the motor vehicle to a stop. Three, the defendant willfully failed or refused to bring the motor vehicle to a stop for or otherwise fled or

6

attempted to elude a pursuing police vehicle. Four, the police officer's vehicle from which the signal to stop was given was appropriately marked, showing it to be . . . an official police vehicle. Five, the defendant engaged in reckless driving. Six, this act occurred on or about the 24th day of October, 2016, in Sedgwick County, Kansas.

"The term willfully means conduct that is purposeful and willful and not accidental. Reckless driving means driving a vehicle under circumstances that show a realization of the eminence [*sic*] of danger to another person, or the property of another, where there is a conscious and unjustifiable disregard of that danger."

The jury instruction on the alternate fleeing and eluding count, count four, listed the same elements except element five. The language "the defendant engaged in reckless driving" was replaced with "the defendant attempted to elude capture for theft, as alleged in count seven." And on count seven, the court instructed:

"In count seven the defendant is charged with theft. The defendant pleads not guilty. To establish this charge each of the following claims must be proved: One, [L.A.] was the owner of the property. Two, the defendant obtained or exerted unauthorized control over the property. Three, the defendant intended to deprive [L.A.] permanently of the use or benefit of the property. Four, the value of the property was at least $1,500, but less than $25,000. This act occurred on or about the 24th day of October, 2016, in Sedgwick County, Kansas. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

The jury found Davis guilty of the first-degree murder charge on both the fleeing and eluding theories and on the theft alleged in count seven.

7

*Standard of review*

Davis argues the two fleeing and eluding theories presented the jury with alternative means of committing felony murder, and that there was insufficient evidence to support a conviction on one of them.

> "When a defendant challenges the sufficiency of the evidence of an alternative means crime, 'sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt.' An alternative means crime is one that can be committed in more than one way. [Citations omitted.]" *State v. Rucker*, 309 Kan. 1090, 1094, 441 P.3d 1053 (2019).

*Discussion*

When the State charges felony murder based on multiple underlying felonies, it is an alternative means crime and under our current caselaw a super-sufficiency requirement is triggered. See *Rucker*, 309 Kan. at 1094 (felony murder an alternative means crime when defendant charged with killing while committing or attempting robbery, rape, aggravated kidnapping, and aggravated burglary); *State v. Reed*, 302 Kan. 390, 398-99, 352 P.3d 1043 (2015).

*The State charged Davis with an alternative means crime.*

The first question is whether the two fleeing and eluding charges are effectively separate crimes, i.e., alternative means of committing the offense. A statute states alternative means of committing a crime when it lists "distinct alternatives for a material element of the crime," but not when it "merely describe[s] a material element or a factual circumstance that would prove the crime." *State v. Brown*, 295 Kan. 181, 184, 284 P.3d 977 (2012). The fleeing and eluding statute provides:

8

"(b) Any driver of a motor vehicle who willfully fails or refuses to bring such driver's vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop, and who:

(1) Commits any of the following during a police pursuit: (A) Fails to stop for a police road block; (B) drives around tire deflating devices placed by a police officer; (C) engages in reckless driving as defined by K.S.A. 8-1566, and amendments thereto; (D) is involved in any motor vehicle accident or intentionally causes damage to property; or (E) commits five or more moving violations; or

(2) is attempting to elude capture for the commission of any felony, shall be guilty as provided in subsection (c)(2).

. . . .

"[c](2) Violation of subsection (b) is a severity level 9, person felony." K.S.A. 2019 Supp. 8-1568.

The statute uses the word "or" to separate the felony crime described in subsection (b)(1) from the one described in subsection (b)(2).

"To determine if an 'or' separates an option that is not an alternative means or separates alternative means, there are several considerations." *Brown*, 295 Kan. at 193. The touchstone is whether the Legislature intended "to list alternative distinct, material elements of a crime—that is, the necessary *mens rea, actus reus,* and, in some statutes, a causation element . . . ." 295 Kan. at 194. "Typically . . . a legislature will signal its intent to state alternative means through structure, separating alternatives into distinct subsections of the same statute." 295 Kan. at 196.

9

"Regardless of such subsection design, however, a legislature may list additional alternatives or options within one alternative means of committing the crime. But these options within an alternative do not constitute further alternative means themselves if they do not state additional and distinct ways of committing the crime, that is, if they do not require proof of at least one additional and distinct material element. Rather they are only options within a means if, as discussed above, their role is merely to describe a material element or to describe the factual circumstances in which a material element may be proven." 295 Kan. at 196-97.

In *Brown*, the court considered language in the aggravated indecent liberties statute that defined the crime as doing prohibited acts "'with the intent to arouse or satisfy the sexual desires of either the child or the offender, or both.'" 295 Kan. at 200-01 (quoting K.S.A. 21-3504[a][2][A]). The *Brown* court held this did not set out alternative means of committing the crime. "[T]he language . . . is merely descriptive of the types of factual circumstances that may prove the distinct, material element of intent to arouse or satisfy sexual desires, that is, the mens rea required for commission of the offense." 295 Kan. at 201. These were "a secondary matter, the potential yet incidental objects of the offender's required intent." 295 Kan. at 202.

But in *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1075 (2016), the court held the aggravated burglary statute did set out alternative means by criminalizing "'without authority, entering into or remaining within'" a place with a particular intent. It reasoned that "'[t]he phrases "entering into" and "remaining within" refer to legally distinct factual situations'" because "entering into" refers to crossing the plane of a building's exterior wall, while "remaining within" refers to continued presence in a building after entry occurred. 303 Kan. at 789.

10

In *State v. Castleberry*, 301 Kan. 170, 339 P.3d 795 (2014), the court addressed the fleeing and eluding statute, but its holding does not resolve Davis' claim. The *Castleberry* court held the "penalty enhancement factors" in K.S.A. 8-1568(b)(1) "are 'options within means,' rather than alternative means." 301 Kan. at 184-85. It reasoned that under subsection (b)(1), the Legislature obviously intended to enhance the crime's severity when "the perpetrator endangered the public safety by the way in which he or she drove his or her vehicle while fleeing or attempting to elude the police." 301 Kan. at 184-85. The State refers us to an unpublished Court of Appeals case that reached the same conclusion. See *State v. Goodpaster*, No. 108,631, 2014 WL 702395, at *7 (Kan. App. 2014) (unpublished opinion).

The issue here is whether there is a material difference between the (b)(1) felony crime and (b)(2) felony crime. We hold there is. K.S.A. 2019 Supp. 8-1568(b)(1) and (2) set out alternative means of committing the felony form of fleeing and eluding. These subsections refer to distinct factual situations. One type of conduct—dangerous driving—elevates the crime to a felony under subsection (b)(1). And that subsection touches on conduct creating an immediate public danger. But evading capture for a felony under subsection (b)(2) is different. It does not necessarily present the same immediate public danger, and a person can commit the subsection (b)(2) crime without engaging in the dangerous behaviors described in subsection (b)(1).

*Sufficient evidence supports both alternative means.*

The next question is whether sufficient evidence supports both alternative means articulated in the court's jury instructions. At the outset, we note Davis does not challenge the State's evidence supporting reckless driving, so our focus shifts to whether there was sufficient proof Davis was "attempting to elude capture for the commission of any felony." He contends this crime requires evidence that Officer McClure subjectively

11

believed she was attempting to capture him for a felony, rather than a traffic-related matter, and the evidence only shows she was trying to stop him for running a stop sign. In other words, he contends our attention should be on the officer's belief—not his.

This requires us to interpret the fleeing and eluding statute. See *State v. LeClair*, 295 Kan. 909, 911, 287 P.3d 875 (2012) (interpreting statute to resolve defendant's argument that conviction lacked sufficient evidence "as a matter of law" based on defendant's interpretation of the statute). "Statutory interpretation is a question of law over which an appellate court exercises unlimited review." *State v. Downing*, 311 Kan. 100, 103, 456 P.3d 535 (2020). And when interpreting a statute, the court begins its "analysis with the touchstone of statutory interpretation:  legislative intent. The best and safest rule for discerning this intent is the plain language of the statute. Only when the statutory language is unclear or ambiguous [does the court] move on to consider tools of statutory construction." *State v. Lundberg*, 310 Kan. 165, 170, 445 P.3d 1113 (2019).

The operative statutory language provides that "any driver" who flees from a traffic stop and "who . . . is attempting to elude capture for the commission of any felony" commits felony fleeing and eluding. To "attempt" means "to make an effort to do, get, have, etc.; try; endeavor . . . ." Webster's New World College Dictionary 92 (5th ed. 2014); see American Heritage Dictionary of the English Language, 85 (1970) (defining "attempt" as "[t]o endeavor to do or make; to try"). This implies an actor's actions are calculated to achieve an objective harbored by the actor. See *State v. Louis*, 305 Kan. 453, 461, 384 P.3d 1 (2016) ("[A]n attempt requires specific intent to commit the object crime . . . .").

Davis' proposed interpretation emphasizing the officer's state of mind relies on *State v. Carter*, 30 Kan. App. 2d 1247, 57 P.3d 825 (2002). *Carter* held that under subsection (b)(2) a defendant's "reason for eluding capture and his actual status were

12

irrelevant and that only the officer's reason for attempting to capture [him] was significant." 30 Kan. App. 2d at 1254. In *Carter*, police investigating a stabbing attempted to pull over a car registered to the defendant, who was the stabbing suspect. Defendant fled from the traffic stop. The State charged him with aggravated battery for the stabbing, and felony fleeing and eluding for leaving the traffic stop. The jury acquitted him of the aggravated battery, but convicted him of felony fleeing and eluding based on attempting to evade capture for the aggravated battery. The *Carter* panel held the evidence was sufficient on the fleeing and eluding charge, despite the aggravated battery acquittal. 30 Kan. App. 2d at 1254.

To reach that result, *Carter* relied on *State v. Hudson*, 261 Kan. 535, 931 P.2d 679 (1997). In *Hudson*, the court examined the obstruction of legal process statute, which provided "[o]bstructing legal process or official duty" was a felony "in the case of a felony," but only a misdemeanor "in a case of a misdemeanor." 261 Kan. at 536 (quoting K.S.A. 21-3808). The *Hudson* court held that whether the "official duty" interfered with was "in a case of a felony" was "to be defined in terms of the officer's authority, knowledge, and intent." 261 Kan. at 538-39. The court said the "touchstone" for the offense was the officer's reason for approaching the defendant who then flees or resists.

But the reasoning supporting the outcome in *Hudson* is not clear. The only authority cited was a Court of Appeals case that held when a defendant was charged with obstructing a court order's execution, it was not necessary to prove defendant knew of the order's existence. See 261 Kan. at 538 (citing *State v. Lyne*, 17 Kan. App. 2d 761, 844 P.2d 734 [1992]). And in determining the *Hudson* rule applied to the fleeing and eluding statute, the *Carter* panel reasoned that both statutes are designed to encourage cooperation with police and punish those who make the officer's job more difficult and dangerous. 30 Kan. App. 2d at 1253.

13

Here, the State contends the obstructing legal process statute does not provide a sound analogy to the fleeing and eluding statute because the legal process statute focuses on the duty obstructed, while the fleeing and eluding statute centers on the defendant's reason for not wanting to be captured. We agree. The fleeing and eluding statute is distinguishable.

The obstruction statute uses passive language to make the defendant's obstruction of the officer's duty a felony or misdemeanor depending on whether the obstruction occurred "in a case of" a felony or misdemeanor. In sharp contrast, the fleeing and eluding statute is a felony if a fleeing "driver . . . is attempting to elude capture for the commission of any felony . . . ." The most natural reading of this language is that it refers to the driver's state of mind about attempting to elude capture. Under the statute's plain language, the crime turns on the driver's subjective intent.

Given this rather obvious statutory perspective, we hold there was sufficient evidence for the jury to conclude Davis fled to avoid capture for a felony. Although the jury acquitted him of attempted aggravated robbery, the State produced evidence tending to show Davis committed that crime the same morning as the attempted traffic stop. And at the time of the stop, Davis was driving a stolen vehicle containing stolen property from two forced-entry home burglaries. A reasonable juror could infer from these circumstances that Davis was attempting to avoid capture for the commission of multiple felonies. See, e.g., *State v. Thach*, 305 Kan. 72, 84-85, 378 P.3d 522 (2016) (holding circumstantial evidence demonstrated defendant entered home with intent to commit aggravated battery when there was testimony defendant accompanied acquaintance to victim's house, acquaintances had discussed killing victim, and acquaintances were upset with victim for boasting about beating up an acquaintance's friends).

14

K.S.A. 2019 Supp. 8-1568(b)(1) and (b)(2) set out material, distinct elements for the crime of felony fleeing or eluding a police officer. Under the plain language of subsection (b)(2), the crime occurs when the driver subjectively intends to avoid capture for a felony. And the circumstances here are sufficient to support a jury finding that Davis intended to avoid capture when he fled from McClure: he was driving a stolen car containing stolen property and other evidence tying him to two residential break-ins and an attempted aggravated robbery earlier on the same day as the chase.

We hold sufficient evidence sustains the felony-murder conviction.

ADMISSION OF THE INCRIMINATING STATEMENTS

Davis argues the district court erred when it admitted into evidence his statements to police. In his view, they were obtained in violation of his rights under the Fifth Amendment to remain silent and *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He believes he invoked those rights by saying "huh-uh" when detectives completed the *Miranda* warnings and asked if he wanted to talk to them.

*Additional facts*

When interviewed by police, Davis admitted he knew he was being pulled over and said he fled because he thought he had a warrant and that his license was suspended. He admitted driving 75 to 80 miles per hour and said he could not stop for the red light because he was going too fast.

Detective Bray, who conducted the interview, testified he first collected personal history information from Davis. Then, he presented a *Miranda* rights form to Davis and read those rights to him. He asked Davis if he understood each right listed at the end of

15

each line on the form. Davis did not have any questions about what any of them meant. And after going over the rights, Bray asked Davis if he wished to answer questions. Bray said Davis "[s]ort of groaned and asked [Bray] what [he] wanted to talk about. And at the same time he was doing that, he was initialing yes or signing it [on the form], so [Bray] took that as an affirmative, that he wanted to go ahead and answer questions."

Bray denied there was "anything during that advisory where [Davis] appeared to, you know, not want to proceed or that caused [him] to feel that [he] needed to clarify what [Davis'] intentions were." And when asked whether Davis indicated at any point during the 40-minute interview that he wished to stop the questioning, Bray said,

> "There was at one point later in the interview where he kinda made a statement about I don't want to talk to you, but in the same—at the same time that he said that, he just continued answering the questions. I don't want to talk about this, but, and he continued talking. So we didn't clarify that but that's the only statement he made like that."

Bray agreed he did not have to prompt Davis to continue talking at that point, and that "it was just kind of a stream of statements coming from his mouth." Then, the detective testified "our conversation just continued, you know, even though he'd said that[,] it just continued. There was no further explanation or nothing else I needed to say to him to get him to continue, we just continued our conversation."

After the interview with Bray, Davis made additional remarks to Officer Mulloy, who transported him to jail. He told Mulloy about the traffic stop, saying: "[I]t was either going to go down like this or I was going to shoot someone." On cross-examination at trial, Mulloy testified Davis was upset at the time and had recently been told the victim died. Mulloy reminded Davis of his *Miranda* rights, then began asking Davis questions. Davis confirmed the skeleton gloves and gun were his and in his possession for several

16

days. He told Mulloy he woke up at 11 a.m. at a friend's mom's apartment, where a man named Oscar gave him the Volkswagen key and offered him a gold ring and some cash to pawn some property for him.

At a hearing on the statements' admissibility, Davis argued they should be excluded. He claimed he said he was "done talking" at several points during the interview with Bray. And he argued the statements to Mulloy were tainted by "ongoing violations from when he invoked or attempted to invoke" with Bray. The court ruled the statements admissible. It said it did not "have any concerns with regard to *Miranda* with regard to the statements . . . . [C]learly the defendant's wanting to talk, the comments about not wanting to talk, clearly he wants to continue to talk about things in general and just immediately keeps talking, but is avoiding certain subjects."

It is important to note both parties and Bray were working from a transcript of the interview during the admissibility hearing. But that transcript was not offered into evidence at the hearing and is not in our record on appeal. And the form Davis initialed and signed was admitted but is also not in the record.

*Issue preservation*

The State asserts Davis did not preserve this issue for appellate review because he did not lodge contemporaneous objections to his statements' admission. Some additional facts are necessary to address this.

Davis' counsel told the court after jury selection, but before opening statements, that he wished to "address . . . now, so we don't have an argument objection during the course" about Davis' interactions with others after the crash that tended to show he lacked remorse. Specifically regarding Bray's testimony, Davis' counsel argued,

17

"There's also a statement made [during] the questions by . . . Detective Bray, and we heard part of the statement, but the question is when you took off running, did you even look back at the driver or check on him or anything. The answer's I didn't really care, because I wasn't thinking. Again, you know, those are issues that are after the fact than anything along those lines, that were stated to Officer McClure. I'm trying to look at my notes exactly on that, but all those issues are after the fact. And what Mr. Davis is being accused of is actions that occurred before the crash, the crash itself, fleeing from the crash. But as far as whether he made inquiry on whether [statements to Bray—in particular] somebody was okay afterwards or investigated if somebody was injured afterwards is not relevant to the charges."

The court then ruled,

"Well, the comment on the detective, *I'm going to overrule any objection to that, because it occurs after* Miranda *and it asks him about actions he took*. He's charged with leaving the scene of an accident, fleeing and eluding. I mean, it's immediate, what did you do, I mean, did you stay, did you go, that sort of—and that goes to the heart of those issues." (Emphasis added.)

At trial, Bray testified before Mulloy. During Bray's testimony, the State began asking him questions about his interview. Bray testified he advised Davis of his *Miranda* rights and Davis agreed to speak with him. He then testified Davis was willing to talk about the collision and what led up to it, but not other subjects. He said Davis acknowledged driving the Volkswagen, knew he was being pulled over, and did not want to pull over because he thought he had a warrant. He testified Davis recalled doing 75 to 80 miles per hour while trying to get away, and trying to stay under 100. And he testified Davis acknowledged trying to stop for the red light but could not because he was going too fast. And he testified he jumped out of the car and ran after the crash and that when

18

quizzed if he looked into the other car to see if anyone was hurt he told Bray "he didn't care, he was trying to get away."

At that point, defense counsel interrupted to "object on pretrial motions." Counsel referenced the pretrial hearing and told the court he wanted to "make sure we renew any objections, any arguments we had to keep [*sic*] Mr. Mulloy's testimony." He objected to the "going to go down" statement as irrelevant and unduly prejudicial. The prosecutor then proffered all the evidence it would seek from Mulloy—the spontaneous statement and the "additional statements . . . after being reminded that he has *Miranda* rights." After the proffer, defense counsel said he was "just renewing earlier objections."

The State claims these circumstances trigger K.S.A. 60-404 limitations. It provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404.

A pretrial objection generally is not enough to satisfy K.S.A. 60-404's contemporaneous objection rule because "'an in limine ruling "is subject to change when the case unfolds."'" *State v. Ballou*, 310 Kan. 591, 613, 448 P.3d 479 (2019). Accordingly, "a pretrial objection must be contemporaneously renewed during trial or preserved through a standing objection." *State v. Inkelaar*, 293 Kan. 414, 421, 264 P.3d 81 (2011), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). The State argues Davis did not satisfy this requirement. It contends he only objected to Mulloy's testimony about his spontaneous comments during transport, and not Mulloy's further questioning after reminding Davis of his *Miranda* rights. It further

19

asserts Davis did not object during Bray's testimony that he invoked his Fifth Amendment right to silence until it was too late. The State's view of the record is mistaken.

Davis reiterated he was renewing his pretrial objections to Mulloy's testimony after the prosecutor proffered Mulloy would testify to both the spontaneous and post-*Miranda*-reminder statements. And Davis repeated his pretrial objections during Bray's testimony during the detective's testimony. Nevertheless, raising the issue after jury selection and before any testimony was presented at trial, as well as raising the issue again before Mulloy's testimony began, was sufficient, even if Davis' counsel had not objected at all during Bray's testimony. Notably, one of the court's specific grounds for admitting the challenged portions of Bray's testimony during the discussion just before opening statements was that they related to statements Davis made after the *Miranda* waiver. Under these facts, we hold counsel's objections sufficiently preserved this issue for appeal.

*Standard of review*

"'When reviewing a motion to suppress evidence, an appellate court determines whether the factual underpinnings of the district judge's decision are supported by substantial competent evidence. The ultimate legal conclusion to be drawn from those facts raises a question of law requiring application of a de novo standard. An appellate court does not weigh evidence to find facts.'

"When the material facts underlying a trial court's decision on a motion to suppress are not in dispute, the question of suppression is a matter of law over which we exercise unlimited review. [Citations omitted.]" *State v. Walker*, 304 Kan. 441, 453, 372 P.3d 1147 (2016).

20

*Discussion*

Davis argues the "huh-uh" response in the transcript to Bray's question whether he wanted to talk was unambiguously negative and sufficient to invoke his right to silence. And he asserts his statements to Mulloy are also inadmissible because police did not honor the invocation to Bray. The State argues the facts do not reveal any *Miranda* invocation. We agree with the State.

*The interview statements with Detective Bray were admissible.*

"'The rules governing an accused's constitutional rights during a custodial interrogation are well established: "The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent." Moreover, in Kansas, "[n]o person shall be a witness against himself [or herself]." Kan. Const. Bill of Rights, § 10. "[A] suspect's invocation of his or her right to remain silent must be scrupulously honored and cuts off further interrogation elicited by express questioning or its functional equivalent."

. . . .

"' . . . If a suspect invokes the right to remain silent during questioning, that interrogation must cease. Thereafter, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'"

"'More recently, law enforcement's duty to scrupulously honor a suspect's decision to invoke his or her *Miranda* rights has been conditioned upon the suspect's ability to communicate that decision without any ambiguity or equivocation. See *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (suppression only required for denial of unambiguous invocation of Miranda rights; objective inquiry). This court has said that we test the clarity of a *Miranda* rights

21

invocation by determining whether a reasonable police officer under the circumstances would understand the suspect's statement as an assertion of a *Miranda* right. [Citations omitted.]'" *Walker*, 304 Kan. at 454.

On this record, Davis' "huh-uh," as apparently reflected in the transcript as a negative response, remains ambiguous in context, and the recording from which the transcript was prepared is not in the record. For that matter, neither is the transcript. And there is no testimony from the transcriptionist to explain the parenthetical negative response attributed to the comment. But what is in the record is Bray's testimony contradicting what would seem to be the transcriptionist's view. The detective testified "there was kind of this groan, it's really noncommittal, but at the same time he's asking what are we gonna talk about and at the same time he's signing the form."

Under these circumstances, it was appropriate for the court to resolve the ambiguity on the record before it. It did this by concluding there was no problem relating to possible *Miranda* violations, and that Davis clearly wanted to talk. Bray's testimony that Davis' response was a noncommittal grunt contemporaneous with signing the waiver and asking what Bray wanted to talk about supply substantial competent evidence to support the court's ruling there were no *Miranda* violations. And this ruling was correct as a matter of law.

A reasonable law enforcement officer under these circumstances would not have viewed Davis' response as an assertion of *Miranda* rights. Davis did not unambiguously invoke his right to remain silent before talking to Bray. Finally, we note Davis does not renew his claim made to the district court that he invoked his right to silence later in the interview with Bray.

22

*Davis' statement to Officer Mulloy was admissible.*

Davis next argues his statement to Mulloy that "it was either going down like this or I was going to shoot someone" was irrelevant and unduly prejudicial. He claims it was error not to exclude it. We disagree. In admitting this statement over Davis' objection, the district court ruled:

"Right. Well, specifically, with the comments, the unsolicited comment he makes about, you know, it was either this or I was going to shoot somebody, or the words that were to that effect, I do think they go to the central issues and are probative, relevant, I should say, evidence as to the felony murder, the depraved heart, the whole, you know, what his intent and motive was, was it simply just speeding or—I think it's critical. So I will allow testimony on that."

On review of a decision to admit evidence, appellate courts consider first whether the evidence is relevant. If the court finds the evidence is relevant, the reviewing court applies the statutory rules governing the admission or exclusion of evidence. *State v. Jenkins*, 311 Kan. 39, 44, 455 P.3d 779 (2020). "On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard." *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). But even if evidence is relevant and otherwise admissible, a district court may exclude it

"if it determines that the evidence's probative value is 'substantially outweighed' by its prejudicial effect [under] K.S.A. 60-445. . . . 'On appeal, this determination is reviewed under an abuse of discretion standard, and the burden of proof is on the party alleging that the discretion was abused.' As this court has repeatedly held:

"'"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken the view adopted by the trial

23

court; (2) is based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based."'" *State v. Ross*, 310 Kan. 216, 224-25, 445 P.3d 726 (2019).

Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some substantial or logical connection between the asserted facts and the inference or result they are intended to establish. *State v. Reid*, 286 Kan. 494, 502-03, 186 P.3d 713 (2008). "This definition incorporates two requirements—the evidence must be both material and probative. Evidence is material when the fact it supports is in dispute or an issue in the case and is probative when it has a logical tendency to prove a material fact. [Citations omitted.]" *State v. Huddleston*, 298 Kan. 941, 959, 318 P.3d 140 (2014).

The State contends this evidence was relevant both to prove defendant possessed a gun, and to prove his conduct was reckless because he knew his actions were dangerous and likely to end badly for himself or someone else. Davis contends his statement was not relevant because the court mentioned felony murder in its ruling, but did not address the State's argument that the evidence was relevant to the attempted aggravated robbery and second-degree murder charges.

Both possession of the gun and recklessness were material because they were elements of the attempted aggravated robbery and second-degree murder charges. K.S.A. 2019 Supp. 21-5420(b)(1) (reciting being armed with a dangerous weapon as element of aggravated robbery); K.S.A. 2019 Supp. 21-5403(a)(2) (listing being reckless as element of second-degree murder); see 1 McCormick on Evidence § 185 (8th ed. 2020) (noting evidence immaterial when "the truth or falsity of the proposition that the evidence is

24

offered to prove has no implications for an element of the claim or offense charged or to a recognized defense").

The district court did not abuse its discretion by concluding the evidence was probative. At the least, the statement Davis might have shot someone tends to demonstrate he possessed a gun. And although the district court did not mention that in its ruling, it did conclude the evidence was probative to the second-degree murder charge—"the depraved heart . . . ."

Admittedly, the probative link between the statement and Davis' reckless state of mind is not as obvious. A person is "reckless" when they "consciously disregard[ ] a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j). And when Davis made the statement, he was upset because he learned Dexter died from his injuries.

But even with that, it appears Davis' statement makes it more likely to be true that, while he was fleeing from McClure, he consciously disregarded a substantial and unjustifiable risk that another motorist could be killed. See 1 McCormick on Evidence § 185 (8th ed. 2020) ("Take, for example, evidence that a defendant charged with assaulting a neighbor has a reputation for being nonviolent. Knowing that someone has this reputation seems to make it less likely that he would commit an assault, presumably because we accept the underlying generalization that a smaller proportion of people with a reputation for nonviolence assault their neighbors than is the case for people generally."). As such, the district court did not abuse its discretion based on relevance.

The next question is whether the district court abused its discretion by allowing the evidence despite the risk of undue prejudice. "Kansas law favors the admission of

otherwise relevant evidence, and the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly." *State v. Seacat*, 303 Kan. 622, 640, 366 P.3d 208 (2016). The burden of persuading a reviewing court that an abuse of discretion occurred is on Davis; and, as the State points out, Davis' only argument on this point is that the "prejudicial effect on Mr. Davis' case is so obvious it requires no explanation." This is decidedly an insufficient argument. We hold Davis fails to carry his burden to show abuse of discretion.

EVIDENCE ABOUT THE VICTIM'S MEDICAL TREATMENT DECISIONS

Davis argues the district court erred by excluding evidence Dexter delayed treatment for his injuries. He argues this was both a violation of the evidence statutes and a deprivation of his right to present a defense under the United States Constitution. The State argues Davis failed to preserve the argument for appellate review because he did not proffer the excluded evidence. We agree with the State.

*Additional facts*

Dr. James Haan, who treated Dexter, testified concerning cause of death. He said Dexter died at 4:15 p.m., a few hours after the crash, from injuries sustained in the collision. Haan said Dexter arrived at the hospital at 12:55 p.m. He had low blood pressure but was still talking. He suffered from multiple chest fractures and severe internal bleeding. Haan testified he attempted to address the injuries and save Dexter.

On cross-examination, Haan said Dexter consented to being intubated but requested surgery not be performed until absolutely necessary. Haan said he tried to stabilize Dexter to be able to treat him through radiology. Defense counsel then asked: "If he had not expressed a desire to put off surgery unless it was absolutely necessary,

26

would you have, on your decision, started operating on him faster or earlier than you did?" The prosecutor objected on relevance grounds before Haan answered, and the court sustained the objection. There was no proffer about what Haan's answer might have been. Defense counsel asked Haan a single additional question about how much time elapsed between Dexter's arrival at the hospital and his death, and then ended the cross-examination.

*Discussion*

Prior to addressing the issue's merit, we must first decide whether this matter is preserved for appellate review. We hold it is not. K.S.A. 60-405 provides,

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

And under our caselaw,

"A party being limited by the exclusion of evidence must sufficiently proffer the substance of the evidence to preserve the issue on appeal. In this regard, K.S.A. 60-405 has a dual purpose: (1) It assures the trial court is advised of the evidence at issue and the nature of the parties' arguments; and (2) it assures an adequate record for appellate review. When the party fails to provide a sufficient proffer of the substance of the evidence, appellate review is precluded because the appellate court lacks a basis to consider whether the trial court abused its discretion.

"But no formal proffer is required if an adequate record is made in a manner that discloses the evidence sought to be introduced. Answers to discovery, the parties' arguments, or in-court dialogue may satisfy K.S.A. 60-405 depending on the

27

circumstances. In considering the adequacy of a proffer made to the trial court, this court has considered information made known both contemporaneously with the trial court's ruling and provided after the trial has concluded. [Citations omitted.]" *State v. Swint*, 302 Kan. 326, 332-33, 352 P.3d 1014 (2015).

At Davis' trial, there was no proffer, formal or informal. In *State v. Hudgins*, 301 Kan. 629, 346 P.3d 1062 (2015), an informal proffer was inadequate to preserve appellate review of excluded evidence relating to a police officer violating department policy during a high-speed chase. Counsel proffered the policy and asserted the officer violated it. But the *Hudgins* court held, "From the record created by Hudgins, we are not aware what, if any, departmental policy might be in dispute or how that policy may have been violated. As a result, we lack sufficient information to determine whether evidence of the unspecified violation might have been relevant." 301 Kan. at 651.

Similarly, the record here does not divulge what Haan would have said about Dexter's wishes concerning his medical treatment. And it does not explain whether another course of treatment was more likely to succeed, or if so, how much more likely. So even assuming this type of evidence could be relevant in defending felony—and second-degree murder charges, there is no information for this court to assess on appellate review whether that line of questioning would have elicited relevant evidence. We hold there is an inadequate basis for appellate review.

PROSECUTORIAL ERROR

Davis contends reversible prosecutorial error occurred during voir dire. He claims the prosecutor shifted the burden of proof to Davis by asking prospective jurors not to hold the absence of evidence on any factual point against the State.

*Additional facts*

During voir dire, the prosecutor asked a prospective juror if she could "understand that the types of information you might need to decide if someone is guilty or not guilty of a crime might be very different types of information than what you would need to decide what punishment that person should receive if they're guilty." He then made the case that those were "[t]wo totally different thought processes, two totally different sets of information." And implying that was the reason, he asked if it would surprise the juror that "the judge is going to limit the evidence that you hear." The prospective juror admitted it did surprise her a little bit and said she wanted to hear all the evidence. The prosecutor answered by saying,

> "You want to hear everything, okay. I have no problem saying this, there will be limits to the evidence that you hear and those limits apply to both sides, okay. So it's not like the rules are different, you know, the State can put on some evidence that the defense can't put on and vice versa. The rules of evidence are the same, what's relevant and admissible is relevant and admissible, period.
>
> "But that said, there might be things that are not really relevant or admissible, things that, you know, pull on your heart strings and are very emotional, might cloud your judgment, right, might make it harder for you to make a good decision, or things that are repetitive, you know, just the same thing again and again and again, through five different witnesses saying the same thing, at some point might be kind of distracting, might be taking your time, might be causing you to forget other more important details. Right?"

The prospective juror persisted that "if you've got to make a good decision you want to know the whole story." The prosecutor replied, "You do. But ultimately, you understand you have to make a decision based on the evidence had – you receive, right?" The prospective juror agreed, and the prosecutor continued,

29

"And it's the State's obligation to put on what it believes is the most helpful, best evidence. If the defense chooses to put on witnesses or evidence, they can, if they choose to put on evidence just by cross-examining the State's witnesses, they can. If they don't want to do anything, they don't have to, because the burden of proof's on the State. You understand that?"

The prospective juror said she did. The prosecutor continued with the following exchange:

"[Prosecutor]: So for any number of those reasons, you may not hear everything, but you have to just accept that whatever I've been given is what both sides want me to get.

"[Prospective juror]: True.

"[Prosecutor]: You know? Okay. If there's something else out there that someone wanted to introduce, they could have chosen to do it, they chose not to, whatever side you're thinking about, doesn't matter. So you just have to go with what you got, all right?

"[Prospective Juror]: Okay.

"[Prosecutor]: And you understand that the rules about what's admissible and not admissible applies to both sides? So let's say that Ms. Burks asks a question and Mr. Owens, ah, I don't like that, he objects, Judge sustains the objection. That means that you don't get to hear the answer or the evidence doesn't come in. You understand you cannot hold that against the defendant?

"[Prospective Juror]: Right.

"[Prosecutor]: Well, the defense is trying to keep me from hearing the whole story. That's not how to works, right?

30

"[Prospective Juror]:  Right.

"[Prosecutor]:  All that's happened in that example is the Judge has made sure that the State followed the rules.

"[Prospective Juror]:  Right.

"[Prosecutor]:  Right? And the same is true the other way, let's say Mr. Owens asks a question, you're like oh, man, that's a great question, I've been waiting the whole trial to hear the answer to that question, and I stand up and I object and the Judge says nope, sustained, the witness is not going to tell you. You can't hold that against the State, either, right? Because that's just the Judge holding the same rules to both sides, right?"

The prospective juror agreed. But another asked, "What if that omission that is not presented by either side is—can that be enough to make you have that reasonable doubt on this person right here? This now innocent man right now?" The prosecutor responded,

"That's like a $5 million question there. You get to decide that, okay. You get to decide how important something is. That said, ultimately, if you're a juror in this case, you're going to take an oath to decide this case based on the facts and the law that are you given. So it's not really fair to either side for you to speculate about well, no one ever talked about this and I bet that it would have—that this other thing would have been Y or X, and so because of that I'm going to have a reasonable doubt. Right?

"It's not—you're not invited to speculate or to guess what other evidence might or might not exist, your job is to look at what you have, make the best decision based on what you got. Kind of like in your school disciplinary type of settings, right? You got to make an informed decision based on the information that you have, okay. . . .?"

31

A third prospective juror chimed in,

"[Y]ou were talking about the omission of certain details and if that seemed wrong. And it just seems strange to me that, say, if it could be evidence that could change it, but it gets omitted by both sides, that could be the difference between somebody being innocent or guilty. So how does that work?"

The prosecutor answered,

"Well, again, you have to decide whether something is important or not important, I can't say whether it's important or not important. And of course, we're all talking hypothetically right now, so it's even more difficult. But again, as long as we all acknowledge that both sides have the opportunity to call witnesses, subpoena people, ask questions, put on exhibits, it's really only fair for you to assume that if it was important, one side or the other would bring it up, right?

"Because if we start to make decisions based on things that aren't introduced, I mean, that's where you can get to someone with those documentaries where Judge is talking about, right, where jury's start to make decisions off of things that neither side has a chance to cross-examine or question or challenge, you know. So we—you know, so that's why you take that oath to say *I'm going to make my decision base order what happens in the courtroom and I'm not going to hold it against either side for something that I didn't get.* I'm going to look at what I got, because that's what the law says I'm supposed to do, is to look at what I got and make my best decision based on it. Does that make sense?"

"[Prospective Juror]:  (Juror nodding head up and down.)

"[Prosecutor]:  I mean, I get it, right, it's kind of this competing idea of well, I want to hear everything and yet you're asking to take it on faith that you attorneys are going to give us what we need, when you haven't heard the case yet, so it's fair heartburn

32

to have. *But what I'm trying to elicit is whether you are all open to the idea of limiting yourself to what you get, okay.*" (Emphases added.)

A fourth prospective juror, who had been on a jury that acquitted a defendant, joined the discussion. The prosecutor asked her not to discuss the facts of the case, but asked,

"Okay. I guess for right now, what I need to know is if the State—based on what you get, if the State does not prove this case to you beyond a reasonable doubt, are you going to be able to vote not guilty again or are you going to say you know, I bet there's something else out there they couldn't give us and so I'm going to vote guilty, even if they didn't prove it, just to be safe?

"[Prospective Juror]:  I just—there has to be a lot there to prove that he's guilty or not.

"[Prosecutor]:  Absolutely. And you're going to hold the State to its burden?

"[Prospective Juror]:  Yeah."

At various other points during voir dire, the prosecutor referenced the State's burden of proof. When a prospective juror mentioned her sister-in-law was murdered, the prosecutor said,

"[W]e're going to talk a little bit about the burden of proof being on the State, beyond a reasonable doubt, wherever that level is for you, on the State, are you going to bring it down a little bit, make it easier for a conviction because of what happened to your sister-in-law?"

He solicited her agreement that she would "still make us prove the case."

33

The prosecutor had a similar exchange with other prospective jurors who had family or acquaintances victimized by violent crimes. And when the prosecutor turned his attention to one who responded earlier to a question from the judge about religious beliefs and the ability to serve as a juror, and asked whether he could serve on a criminal jury, the prospective juror responded: "I think so, I just had—the evidence has to be proven." The prosecutor replied,

"Absolutely, yeah. And by none of the questions that I ask while I'm up here do I mean to indicate that the burden is not there and it's not on the State or anything like that. But if the State proves to you beyond a reasonable doubt that the defendant committed one or more of these crimes, can you vote guilty?"

After the jury was selected and the evidence was in, the district court instructed the jury that "[t]he State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty, unless you are convinced from the evidence that he is guilty."

*Standard of review*

"'In considering a claim of prosecutorial error, [the court] follow[s] a two-step analysis. [It] first determine[s] whether an error occurred. Second, if an error has been found, [it] evaluate[s] the prejudice [the error] caused to determine whether it was harmless. At the first step, error occurs if the appellate court determines the prosecutor's actions or statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." A criminal defendant establishes the first prong by establishing the prosecutor misstated the law or argued a fact or factual inferences with no evidentiary foundation.' [Citations omitted.]" *State v. Patterson*, 311 Kan. 59, 70, 455 P.3d 792 (2020).

34

*Discussion*

Davis argues the prosecutor's comment that jurors should not "hold it against either side for something that [they] didn't get" was error because "[i]t is improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof." *State v. Stone*, 291 Kan. 13, 18, 237 P.3d 1229 (2010). He contends the prosecutor effectively told the jury not to hold the absence of evidence against the State.

To determine if the comment was improper, the voir dire record must be viewed in its entirety. See *State v. Robinson*, 303 Kan. 11, 272, 363 P.3d 875 (2015) (prosecutor's question whether jurors could acquit if State did "horrible job" presenting case did not imply lower burden of proof when voir dire record revealed prosecutor was trying to expose bias that might have been present from case's extensive media publicity), *disapproved on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017); *State v. Blansett*, 309 Kan. 401, 414-15, 435 P.3d 1136 (2019) (prosecutor's comment that defense could have introduced recordings of defendant's police interview did not attempt to shift burden of proof because, when viewed in context, comments were a response to defense suggestion that State was hiding defense-friendly evidence from jury and did not suggest defendant bore burden to disprove case).

Mentioning the defense's ability to present evidence has been held proper when the commentary's purpose is to rebut a defense suggestion the State has omitted evidence necessary to corroborate its case. See *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016); *Blansett*, 309 Kan. at 414-15. But burden shifting has occurred when the State implies defendant must produce evidence of innocence, such as in S*tate v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004), when the State advocated conviction by rhetorically asking the jury whether there was any evidence the events described by the victim "didn't

35

happen . . . ." The prosecutor's remark here did not advocate shifting the burden of proof to defendant, given its context.

The prosecutor's phrasing—that the jury may not hold "something [it] didn't get" against either side—may have been inartful. But if the State's proof on any element was lacking, the jury was bound by the court's instructions to hold that absence of evidence against the State. See *Miller v. State*, 298 Kan. 921, Syl. ¶ 5, 318 P.3d 155 (2014) ("In Kansas criminal proceedings, the State has the burden to prove the accused's guilt beyond a reasonable doubt. To satisfy that burden, the State must prove each required element of the charged crime."). The prosecutor's extended dialogues with prospective jurors reflect he was trying to make the point that the jury would have to base its verdict on the evidence presented in court, not that it should refuse to hold against the State the absence of prosecution evidence necessary to prove the crime. The prosecutor explicitly reiterated during the exchange that he was "trying to elicit . . . whether you are all open to the idea of limiting yourself to what you get . . . ." These statements do not amount to burden shifting.

## NO CUMULATIVE ERROR

Given our disposition on Davis' claims, there is no cumulative error. See *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

## JAIL TIME CREDIT

Davis argues the district court erred in the sentencing journal entry when it declined to apply 599 days of jail credit to his sentence, contrary to what he believes the court ordered at the sentencing hearing. Davis points to when the court commented that it

36

would "order that you receive credit towards your sentence for all the time you've spent in custody in this case." The court did not elaborate.

In the written journal entry, the court noted Davis was in custody for 599 days in the Sedgwick County jail, from October 24, 2016, until sentencing on June 15, 2018. The journal entry did not award any credit for this, explaining: "From 10/24/16 to 6/15/18, defendant was also held on 16CR3100. As this case is consecutive to 16CR3100, defendant is not eligible for duplicate credit in 16CR3114." The journal entry reflected the "Sentence Begins Date" as "[t]o be determined."

Davis contends this resulted in an illegal sentence because, in his view, it conflicts with the sentence pronounced from the bench. We disagree.

"'Sentencing in a criminal proceeding takes place when the trial court pronounces the sentence from the bench.' Once a legal sentence has been pronounced from the bench, the sentencing court loses subject matter jurisdiction to modify that sentence except to correct arithmetic or clerical errors. [Citations omitted.]" *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014); see also K.S.A. 2019 Supp. 21-6820(i) (allowing sentencing court to retain power to correct any arithmetic or clerical errors).

Under Kansas law,

"In any criminal action in which the defendant is convicted, the judge, if the judge sentences the defendant to confinement, shall direct that for the purpose of computing defendant's sentence and parole eligibility and conditional release dates thereunder, that such sentence is to be computed from a date, to be specifically designated by the court in the sentencing order of the journal entry of judgment. Such date shall be established to reflect and shall be computed as an allowance for the time which the defendant has spent incarcerated pending the disposition of the defendant's

37

case. In recording the commencing date of such sentence the date as specifically set forth by the court shall be used as the date of sentence and all good time allowances as are authorized by the secretary of corrections are to be allowed on such sentence from such date as though the defendant were actually incarcerated in any of the institutions of the state correctional system." K.S.A. 2019 Supp. 21-6615(a).

Before 2011, substantively identical language was codified at K.S.A. 21-4614. In discussing that statute, the court has said,

"Under Kansas law, a judge who sentences a defendant to confinement is required to grant credit for the time which the defendant spent incarcerated pending the disposition of his or her case. 'The provisions of K.S.A. 21-4614 are mandatory and require that a criminal defendant sentenced to incarceration be given credit for all time spent in custody solely on the charge for which he is being sentenced.' [Citations omitted.]" *State v. Harper*, 275 Kan. 888, 890, 69 P.3d 1105 (2003).

The court has also held "K.S.A. 21-4614 contains no provision for credit in excess of the time an individual is actually incarcerated in jail." *State v. Lofton*, 272 Kan. 216, 217-18, 32 P.3d 711 (2001). Accordingly, when consecutive sentences are imposed for multiple crimes the defendant's time in custody can only be awarded against one of the sentences.

In *Lofton*, the court applied this rule to hold that when a defendant was convicted of two crimes in a single case, and consecutive sentences were ordered, the defendant was not entitled to have each sentence reduced by the full amount of time he spent in jail pending the charges. 272 Kan. at 218. And the Court of Appeals has applied this rule to hold that if consecutive sentences are imposed in separate cases, the defendant is still only entitled to a single day of jail time credit for each day spent in jail—that "'[j]ail credit awarded in two cases for the same dates can only be counted once when sentences are run consecutively.'" *State v. Molina*, No. 98,244, 2008 WL 4222917, at *5 (Kan. App.

38

2008) (unpublished opinion) (quoting another unpublished Court of Appeals' decision in *Worrell v. State*, No. 97,611, 2008 WL 762514, at \*2 [Kan. App. 2008] [unpublished opinion]).

Within this legal framework, there is a problem with Davis' argument. The court's oral pronouncement arguably was ambiguous because it qualified its jail-credit order to time spent "in custody in this case." There is a legal standard governing jail credit—credit in a case is given for time spent in custody "solely on the charge."

Davis' journal entry indicates the 599 days were awarded as jail credit against another case's sentence, to which the sentence in this case would run consecutive. Nothing suggests this is not true. And under the rule in *Lofton* and *Molina* no jail credit may be awarded against the sentence in this case because it has already been "used up" in the prior case. Nothing in the record demonstrates the journal entry is inconsistent with either the court's oral pronouncement or Kansas law. We hold there was no error.

Affirmed.

BEIER, J., not participating.
MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 119,871 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.